USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/16/2010

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x

Steve Yu,

                Plaintiff,

                       - against -

New York City Housing Development Corporation
(HDC), PELLEGRINO MARICONDA, Sued
herein in his Official and Personal Capacity,

                       Defendant(s).

-----------------------------------------------------------------------x

07cv5541 (GBD) (MHD)

PRO SE PLAINTIFF' RULE
56.1 STATEMENT OF
<u>MATERIAL FACTS</u>
<u>NOT IN DISPUTE</u>

Via The Pro Se Office Clerk of This Court:

        Pro se Plaintiff, <u>Steve Yu</u>, respectfully submit, pursuant to Rule 56 of Federal Rules of Civil Procedure and Local Civil Rule 56.1, the following statement of material facts not in dispute. The factual materials which are the sources of these statements are referred to by the following abbreviations:

        Affidavit of Pro se Plaintiff Steve Yu ("Pl. Aff.")

        Transcript of Deposition of Plaintiff ("Pl. Dep.")

        Plaintiff's Amended Complaint ("Compl.")

        Declaration of defendant Pellegrino Mariconda ("Mariconda Decl.")

        Declaration of Mary McConnell ("McConnell Decl.")

        Defendants Amended Answer ("Answer")

        Declaration of defendants' counsel Dean L. Silverberg ("Silverberg Decl.")

2010 JUL 19 P 4: 24
RECEIVED SDNY PRO SE OFFICE

**Parties**

1.      HDC, a public benefit corporation of the State of New York, established in 1971 under Article XII of the New York Private Housing Finance Law to increase the supply of multi-family housing by providing financing for the construction and preservation of affordable housing through low interest mortgage loans for developers within New York

City, New York. Actually I had been an employee of HDC from August 1, 2005 to June 21, 2006. HDC was my employer for the same time period (Pl. Aff., ¶¶ 20-34).

2. Mariconda, who was born on February 21, 1976, was 28 years old when he was hired by HDC for a newly created position of deputy CIO. Mariconda has been sued in his individual and official capacities for the instant case (Pl. Aff., ¶¶ 35-57).

3. Mariconda had been an immediate, sole supervisor for all 10 to 15 members of IT team in HDC, with a title of CIO from June 2005 until June 21, 2006. Mariconda had no IT knowledge and experience at all. Mariconda had majors in Business Logistics and Finance (Pl. Aff., ¶¶ 42-51).

4. Mariconda had arranged my two job interviews in June 2005 after I faxed my resume. At my first job interview, Mariconda spent time introducing me HDC's business, financial stableness and benefits programs for employees. Mariconda offered me a job, Apps/DBA, in HDC started as a "consultant" so I would be brought to the board of HDC quicker (Pl. Aff. ¶¶ 268-281).

5. I, Steve Yu, am a citizen of the United States of America. I am of Chinese National Origin. I was born a Chinese (Pl. Aff., ¶ 2).

6. I was unlawfully terminated by Defendants on June 21, 2006 when I was 50 years old, in less than a month after I complained unlawful discriminatory activities to HDC (Pl. Aff., ¶¶ 674-852).

**Plaintiff's "Consulting Agreement" / "Contract"**

7. After I commenced my employment in HDC, attended at a conference call and got an assignment, I was given a printed agreement pre-signed by Crotty and McConnell and pre-approved by Crotty (Pl. Aff., ¶¶ 286-311).

8. I had filed my (my family) tax returns for year 2005 and 2006 as an employee of HDC pursuant to the IRS' Ruling in January 2007 and rules. The IRS forms generated by HDC for my incomes in year 2005 and 2006 were filed as the IRS forms W-2 pursuant to the IRS's Ruling and rules. HDC must have paid tax for my income in year 2005 and 2006 pursuant to the IRS's Ruling and rules. (Pl. Aff., ¶¶ 137-147, 186-187).

9. I had filed my (my family) tax returns for year 2005 and 2006 as an employee of HDC pursuant to the IRS' Ruling in January 2007 and rules. HDC must have paid tax for my income in year 2005 and 2006 pursuant to the IRS' Ruling and rules, the same as for all other employees in HDC (Pl. Aff., ¶¶ 137-147, 186-187).

10. I was mandated to be available around the clock by HDC. HDC had given me a Laptop and BlackBerry with remote access capability. I was mandated by HDC to work on HDC's premises during the regular business hours. I was often required by HDC to work at nights, weekends, even holidays on site and ff site. I was required by HDC to come to HDC's premises earlier so that I and Patibandla could cover the systems longer during the regular business hours. My earned incomes from HDC in year 2005 and 2006 were my all earned incomes for these two years (Pl. Aff., ¶¶ 137-147, 148-196).

11. I had only carried out assignments assigned and approved by Mariconda. Mariconda had strictly controlled my assignments with the instructions, guidelines, time frames. Mariconda had arbitrarily changed and cancelled my assignments via routine, mandated weekly Apps/DBA meetings among Mariconda, Patibandla and me, via emails and phones, and in person. All my off-site assignments were approved and assigned by Mariconda. I was not allowed to work off-site during the regular business hours. I was required by Mariconda to come to HDC's premises earlier so that I and Patibandla could cover the IT systems longer during the regular business hours. I had taken some time to familiar with HDC's IT systems before I actually started my assignments, the same as my all other employee jobs (Pl. Aff., ¶¶ 137-147, 148-196).

12. Every two weeks, I was required to submit bi-weekly timesheet with list of tasks to Mariconda. After Mariconda verified with the time and tasks, he signed. If time or tasks listed needed to change, I would change them accordingly and resubmit them to Mariconda for his verification and signature (Pl. Aff., ¶¶ 137-147, 148-196).

13. Based upon Mariconda's assignments for me, I had been working at rate of 35 hours a week, the same as employees of HDC. I had worked only fifty eight (58) hours for consecutive two weeks. I had worked over ninety two (92) hours in a consecutive two weeks, and over fourteen (14) hours a day. All these fluctuations of hours were similar to Patibandla's, based upon Mariconda's assignments and approvals (Pl. Aff. ¶¶ 137-147, 148-196).

## Members of the IT Department / Team

14. Patibandla and I were only two Apps/DBAs in IT team from August 1, 2005 to May 17, 2006. There were six to four Apps Developers in IT team during my tenure in HDC. All of them are of Indian National Origin. They are Kulkarni, Kar, Sivaprakasam, Pandu, Varghese, and Palanippan. Patibandla, Kar and Kulkarni are not citizens of the Unites

States of America. Nationalities of other three have been unanswered by defendants. Patibandla and Kar were 35 yeas old when they were hired by HDC. Kulkarni was 30 years old when she was hired by HDC. Sivaprakasam was 33 years old when she started to work in HDC. Pandu was 25 years old when he started to work in HDC. Palanippan and Varghese were both 44 year old when their employments with HDC terminated in August 2005 and January 2006, respectively (Pl. Aff. ¶¶ 58-120, 121-136).

15. Antao started to work part-time in HDC at age 22 in August 2004. She was neither Apps Developer nor Apps/DBA related to Oracle Applications system in HDC. On May 1, 2006, she "became" an employee of HDC for the position she had been working on since August 2004. There was no vacancy of employee's position. Sivaprakasam was 33 years old when she started to work in HDC as either a consultant or an employee of Quest America Inc. She became an employee of HDC for a newly created an Apps Developer of employee position at age of 35 years old (Pl. Aff. ¶¶ 133-134, 226-235, 259-265).

16. Antao's initial salary was $30.00 per hour for total $50,000 a year. In less than a year, Antao had an over 26 percent raise. Antao had kept working at part-time basis. On May 1, 2006 at age 24, she "became" an employee of HDC for the position she had been working on since August 2004. There was no vacancy of employee's position (Pl. Aff. ¶¶ 259-265).

17. Sivaprakasam was 33 years old when she started to work in HDC as either a consultant or an employee of Quest America Inc. She became an employee of HDC for a newly created an Apps Developer of employee position at age of 35 years old (Pl. Aff. ¶¶ 133-134, 226-235).

18. On June 27, 2006, in less than a week from my unlawful termination, HDC offered a job to Goel as an Apps Developer. Goel was 25 years old then. Goel's job is the same job as Kar had been offered by HDC when Kar joined HDC as an employee four months earlier on February 14, 2006. Goel had been working for HDC since then. Meanwhile, HDC had continuously paid much more for Storozuk's intensive services on-site and off-site for doing Apps/DBA jobs and mentoring Kar becoming Apps/DBA (Pl. Aff., ¶¶ 252-258, 602-606, 656-659, 725-737).

**Shibaji (Shiv) Kar**

19. Kar had an interview on December 29, 2005 just two days after Varghese officially announced he was leaving HDC. It has been unanswered that how and when Kar applied

for the job in HDC. Kar started to work as an Apps Developer for the vacancy of Varghese on February 14, 2006 (Pl. Aff. ¶¶ 58-65).

20. Mariconda unlawfully put Kar into the vacancy of Patibandla in May, 2006 and overlook me on the vacancy. Mariconda had asked Storozuk and me to mentor Kar on Apps/DBA's skills and knowledge. Mariconda had assigned task for Kar to find some training classes on Apps/DBA. The only qualifications for Kar to be an Apps/DBA of HDC's employee were his age, of his Indian National Origin. (Pl. Aff. ¶¶ 66-81, 656-660, 665-673, 776-778, 786-788).

21. Kar had little knowledge, experience, skill for an Apps/DBA when he joined the HDC as an Apps Developer. Kar had little knowledge about Apps system. Kar had never worked as an Apps/DBA before. Kar could not solve Business Intelligence/OLAP performance issues. Kar had never dealt with Oracle database before. Kar had never worked with Oracle Tech. Support before (Pl. Aff. ¶¶ 66-77, 363-368, 396-399, 437-438, 600-606, 656-660, 725-737, 767-771, 776-788).

22. It has been unanswered that when and which major Kar had earned his degree from University of Nebraska. Kar is incapable of following instruction in English, even with some helped explanations. Kar was "stumbled" on Apps/DBA's README from Oracle Corporation.  Kar needed a condensed, highlighted instruction in plain English made by Storozuk to follow up and to do his basic and simple Apps/DBA's job (Pl. Aff., ¶¶ 79, 428, 602-606).

23. Kar had been on-the-job training as an Apps/DBA after Patibandla left HDC. Kar had been intensively mentored from either Storozuk or me after Mariconda assigned several simple and basic Apps/DBA tasks to him since May 2006. Kar had continuously been seeking helps from either me or Storozuk on his simple and basic Apps/DBA tasks (Pl. Aff. ¶¶ 66-81).

24. Kar was 35 years old when he stared to work in HDC in February 14, 2006. Kar is not a citizen of the United States of America. Kar is of Indian National Origin (Pl. Aff. ¶¶ 58-60).

25. It has been unanswered that when and how Kar applied for the job in HDC. It was just two days between Varghese's announcement and Kar's interview in HDC for the pending vacancy of Varghese's (Pl. Aff. ¶¶ 61-65).

26. Kar had little knowledge about Apps/DBA when he worked for HDC. Kar had little knowledge about Apps system. Kar is disqualified for Apps/DBA. The only qualifications for Kar to be an Apps/DBA of HDC's employee were his age, of his Indian national origin. (Pl. Aff. ¶¶ 66-77, 363-368, 396-399, 437-438, 600-606, 656-660, 725-737, 767-771, 776-788).

27. Kar had never worked with Oracle Tech. Support before when he joined HDC. It is impossible for Apps/DBA who had never worked with Oracle Tech. Support to deal with issues of Oracle Applications and Database (Pl. Aff., ¶¶ 69-71).

28. Kar is incapable of correcting his unknowledgeable and incorrect changes to the production (Apps) system as one of basic Apps/DBA's duties. Mariconda just assigned me to deal with it. I solved it in hours after I got the assignment in early morning June 21, 2006. It was my last problem-solving task. It was my last task in HDC (Pl. Aff., ¶¶ 369, 437-439).

29. Kar had had intensive hands-on training / mentoring on Apps/DBA from either Storozuk, on-site and off-site, or me, anytime, under requests of Mariconda, especially after Mariconda sent out an email of "Change of Roles". Mariconda assigned task for Kar to find some training classes. Kar had taken at least two five-day Apps/DBA training classes in Oracle Corporation shortly after my unlawful termination (Pl. Aff., ¶¶ 369, 437-439).

30. Kar just copied many web pages to email and sent them to everyone in IT team when dealing with issues in HDC. Kar is incapable of understanding the web pages were not related to the issue in HDC (Pl. Aff. ¶ 428).

31. Kar just copied the article from Oracle Tech. Support in his email and sent it out to everyone in IT team when dealing with the issue in HDC. Kar is incapable of understanding the article is not suited for the issue in HDC (Pl. Aff. ¶ 428).

32. After my unlawful termination, Storozuk spent much more time than Storozuk had spent in mentoring Patibandla before, on-site and off-site mentoring Kar becoming an Apps/DBA. Kar had, shortly after my unlawful termination, taken at lease two (Apps/DBA) training classes from Oracle Corporation for total about ten business days (Pl. Aff. ¶¶ 68, 73-76).

**Srinivasa Rao Patibandla**

33.    Patibandla, who was born on June 12, 1969, was 35 years old when he became an employee of HDC as an Apps/DBA on February 14, 2005. Patibandla resigned from HDC on May 22, 2006 (Pl. Aff., ¶¶ 82, 86).

34.    Patibandla is not a citizen of the Unites States of America. Patibandla is a citizen of India and of Indian National Origin (Pl. Aff., ¶¶ 83-84).

35.    It has been unanswered that how Patibandla applied for the job in HDC and who had interviewed with Patibandla (Pl. Aff., ¶ 85).

36.    Patibandla can not do his job up to the expectation of HDC as an Apps/DBA. Patibandla had no immediate solution for Apps and Databases, particularly Patibandla needs to learn more .. and training on Oracle Apps and databases (Pl. Aff., ¶¶ 89, 117).

37.    Patibandla had 4.5%, $4,545 raise on May 1, 2006 just two weeks before May 17, 2006. Patibandla had 1%, $1,000, raise on May 1, 2005, just less than three months after he joined HDC with salary $100,000 on February 14, 2005 (Pl. Aff., ¶¶ 89-91).

38.    Patibandla had been continuously under on-site and off-site mentoring by Storozuk on his most Apps/DBA's duties (Pl. Aff., ¶¶ 95-99, 100-108).

39.    Patibandla had been incapable of patching up dev/test Apps system after several months time by following up Storozuk's instructions. Patibandla gave it up eventually (Pl. Aff., ¶¶ 96-99).

40.    Patibandla had been incapable of installing Apps system from software on DVD after several weeks' preparation and three-whole days working together with Storozuk. Mariconda gave it up without any single question about the failure from Patibandla and Storozuk (Pl. Aff., ¶¶ 100, 496-507).

41.    Patibandla had been incapable of installing Image system in several weeks. Mariconda just reassigned the task to me (Pl. Aff., ¶¶ 532-537, 538-545, 546-550, 551-566).

42.    Patibandla, together with Storozuk, had applied patches directly, without pre-tested, to the production (Apps) system in three days. Patibandla, together with Storozuk, had been incapable of dealing with severe major business interruption after such un-tested patching. Mariconda reassigned the task to me to deal with such severe issue while business users were holding on their daily business pending on the solution (Pl. Aff., ¶¶ 101-103, 208, 370-390).

43.    Patibandla had been incapable of preparing Imaging System for migration of production (Apps) system after almost a month time period. Mariconda just reassigned the

task to me. Patibandla had refused to transfer any information to me. During his weeks' dealing with Oracle Tech. Support and 170System, Oracle Tech. Support asked him to have an Apps/DBA in HDC dealing with the issue (Pl. Aff., ¶¶ 609-613, 614-618, 619-621).

44.     Patibandla, together with Storozuk, had migrated a production (Apps) system to a new server in three days. Without letting anyone in HDC know, Patibandla had immediately filed a SR with Oracle tech. Support for one of major remaining issues (Pl. Aff., ¶¶ 104-108, 622-624, 626-635).

45.     After several days without solution on the issue, Patibandla had raised SR to highest severity level with Oracle tech. Support without anyone noticed (Pl. Aff., ¶¶ 104-108, 622-624, 626-635).

46.     Once business users reported that newly migrated production (Apps) system was hanging on May 17, 2006, Patibandla immediately called Storozuk under request of Mariconda. Patibandla had been incapable of dealing with such issue in either professional or technical manner (Pl. Aff., ¶¶ 104-108, 622-624, 626-635).

47.     Mariconda reassigned the task to me before Patibandla resigned from HDC. I had worked effectively with Oracle tech. Support and solved the problem timely (Pl. Aff., ¶¶ 104-108, 622-624, 626-635).

48.     Patibandla had been making production (Apps) system daily backup at more than fifty (50) percent failed rate over five months period before I joined HDC (Pl. Aff., ¶ 322).

49.     Patibandla had had very unprofessional attitude towards to me and other members of IT team. Patibandla arbitrarily overruled Mariconda's assignments. Mariconda, as an immediate, sole supervisor for all 10-15 members of IT team, just followed Patibandla's claims without any questions, without any disciplinary actions against Patibandla (Pl. Aff., ¶¶ 115-116, 445-471).

50.     Patibandla had very often changed something in systems without anyone noticed, definitely without Mariconda's pre-approval. Patibandla had never sent out what he had changed and/or applied to the systems in respect of technical issues (Pl. Aff., ¶¶ 110-112, 90-91, 94, 87).

51.     Patibandla had undone, without pre-approval from Mariconda, what I had done to one of Oracle databases according to Mariconda's assignment prior days. Mariconda had no single question about Patibandla's such unprofessional, waste time (several days) conduct.

Until Patibandla resigned from HDC, Mariconda asked me to undo what Patibandla had done on my original assignment. It is seven months later (Pl. Aff., ¶¶ 472-474).

52.   Afternoon of May 17, 2006 was Patibandla's last presence in HDC's premises after he was hollering and acting totally out of control while explosively, very unprofessionally, unsafely arguing with both Kulkarni and Mariconda in front of his desk and most members of IT team (Pl. Aff., ¶ 87).

53.   Some members of IT team left the room because they did not feel safe while Patibandla, Mariconda and Kulkarni were having explosive, very unprofessional, and unsafe arguments (Pl. Aff., ¶ 88).

54.   Patibandla is not a team player and lacking of communication and interpersonal skills. Patibandla was required to improve several areas: technically, be a better team player and communication better (Pl. Aff., ¶ 92).

55.   Patibandla is (an) unstable person in this role (Apps/DBA) puts organization (HDC) at risk to lose valuable business data (Pl. Aff., ¶ 93).

56.   As long as Patibandla could behave without out of control, without hollering, Patibandla can continue to work as an employee, Apps/DBA in HDC, without any disciplinary action according to HDC policy. The only qualifications for Patibandla being an Apps/DBA of HDC's employee were his age, of his Indian national origin (Pl. Aff., ¶¶ 94, 120).

57.   It has been unanswered that which year and major Patibandla had graduated with Master Degree. It has been unanswered what Patibandla's working status was (Pl. Aff., ¶ 118).

58.   It has been unanswered that why Patibandla, as an only Apps/DBA in HDC in June 2005, had never interviewed me while I was having two separate interviews for Apps/DBA position arranged by Mariconda (Pl. Aff. ¶¶ 270-278, 288-289).

59.   HDC had the most productive 2006 fiscal year, (11/1/2005 – 10/31/2006), with a net assets increase of $138.7 million. HDC had 157 employees with over $2 million revenue per employee. Employees of HDC are public employees (Pl. Aff. ¶¶ 22-27, 33).

60.   Mariconda had been acted as "… he get frustrated …", "He is very frustrated …", " .. he is upset, irritated" (Pl. Aff. ¶¶ 55-57).

61. Mariconda had promised me that when there is a vacancy of Apps/DBA of employee I would be filled with it (Pl. Aff., ¶¶ 279-281).

62. Mariconda had promised me I would receive a mail of the agreement for one year term before August 1, 2005. I had never received a mail of agreement before August 1, 2005. After I commenced my employment in HDC, attended a conference call and got an assignment, I was given a printed agreement pre-signed by Crotty and McConnell, and pre-approved by Crotty (Pl. Aff., ¶¶ 286-311).

63. Defendants counsel raised his voice to force me say what he desired to hear during my deposition. I had been an employee of HDC from August 1, 2005 to June 21, 2006 (Pl. Aff., ¶¶ 309-311).

64. After I had been worked as an employee of HDC for months, Mariconda knew my age close to 50 instead of much younger based upon my much younger looking then (Pl. Aff., ¶¶ 344, 346).

## The Internal Revenue Service & Relationship of Employee (Steve Yu) and Employer (HDC)

65.    "We hold the worker (Steve Yu) to have been an employee of the agency (HDC). … for services performed in 2005 and 2006." had stated by the Internal Revenue Service ("IRS"), on January 2007. in its Determination Letter for Form SS-8 (Pl. Aff., ¶ 137).

66. HDC had responded to the IRS' request for filling Form SS-8 and Additional Information Required for a Determination 8 (Pl. Aff., ¶ 138).

67. HDC had filled the Form SS-8's all three Parts, I. Behavioral Control; II. Financial Control; III. Relationship of the Worker and Firm (Pl. Aff., ¶ 139).

68. What McConnell had stated in her Declaration (Docket Entry No. 65. McConnell Decl., ¶¶ 8-11.) was a small selective portion of what HDC had filled the IRS' Form SS-8 in year 2006 (Pl. Aff., ¶ 140).

69. "Therefore, your statement that the worker was an independent contractor pursuant to a written agreement is *without merit*." the IRS stated, pursuant to the 26 U.S. 31.3121(d)-1(c)(2), *"Common law employees"* and the Title 26 U.S. 31.3121(d)-1(a)(3) (Pl. Aff., ¶ 141).

70. "The facts presented in this case evidence that the agency retained the right to change the worker's methods and to direct the worker to the extent necessary to protect its

investments, and thus retained behavioral control over the work relationship." (Pl. Aff., ¶ 142).

71. "The facts presented in this case do not evidence that the worker performed his services for the firm as part of his own business operations, but rather do evidence that the agency retained financial control over the work relationship." (Pl. Aff., ¶ 143).

72. "The facts presented in this case do not evidence that the worker performed services for the agency in the capacity of an independent contractor… it is clear that the worker performed services in a manner consistent with an employer-employee relationship." (Pl. Aff., ¶ 144).

73. "This ruling pertains only to the work relationship addresses in this letter; however, it may be applicable to any other individuals engaged by the agency under similar circumstances." (Pl. Aff., ¶ 145).

74. After the IRS's Ruling in January 2007, HDC had stopped singing the "contract" between HDC and individual for any position. HDC must have paid taxes for my income of year 2005 and 2006 as an employee pursuant to the IRS Ruling and rules (Pl. Aff., ¶ 146).

75. As a matter of fact, HDC had never signed the "contract" between HDC and individual for the position of Apps/DBA or Oracle DBA either prior to or posterior to August 1, 2005 (Pl. Aff., ¶ 147).

76. The hiring party (HDC) had strictly controlled the `manner and means' by which the worker (Steve Yu, Pro se Plaintiff, me) completes (his, my) assigned tasks. (Pl. Aff., ¶¶ 148-177, 197-203, 205-221, 370-390, 396-400, 401-422, 423-428, 437-439, 457-471, 576-582, 588-593, 609-621, 625, 639-640, 641-655)

77. Mariconda was my immediate, sole supervisor during my tenure in HDC (Pl. Aff., ¶ 49).

78. Mariconda, as an immediate, sole supervisor for all 10-15 members of IT team, had decided when, how and who to deal with problems with a little discussion or without discussion at all with either Patibandla or me to carry out his assignments or just to be held (Pl. Aff., ¶¶ 165-166).

79. I had been working, side by side, alternatively, overlapped, shared with Patibandla, an Apps/DBA of employee, on the same title and responsibilities during my tenure, as an employee, in HDC (Pl. Aff., ¶¶ 148-177, 625).

80. I, the same as Patibandla, was mandated to attend weekly routine Apps/DBA meeting with Mariconda and Patibandla (Pl. Aff., ¶ 150).

81. Mariconda had assigned most projects like tasks to Patibandla (often together with Storozuk), and integral, routine, regular daily business tasks to me (Pl. Aff., ¶¶ 95-99, 100-108, 154).

82. My daily activities for HDC were: check up IT systems availabilities and daily backups every morning, including weekends; on around the clock full-time basis, monitoring systems performance and troubleshooting on any moment if any troubles occurred either reported by end-user or detected by automated monitoring via BlackBerry; consistently share all these daily tasks with Patibandla; perform on assignments followed instructions and guidelines Mariconda had given (Pl. Aff., ¶ 169).

83. Very often, Mariconda had arbitrarily switched assignments between Patibandla and me (Pl. Aff., ¶¶ 152, 370-395, 421-422).

84. I had been mandated by HDC to work on HDC's premises during the regular business hours, even some weekends (Pl. Aff., ¶¶ 170-171, 615-616, 625).

85. I had been mandated by HDC being available around the clock, seven days a week, including nights, weekends, holidays (Pl. Aff., ¶¶ 189, 352, 374, 583-593, 625).

86. I had taken sometime to familiar with HDC's IT systems, configurations, and requirements, the same as my all other employee jobs for other employers, prior to and posterior to HDC, before I started to work on my first assignment (Pl. Aff., ¶¶ 155).

87. My payments were based upon Mariconda's assignments I had carried out and upon his approval and signature (Pl. Aff., ¶¶ 178).

88. Mariconda had strictly set and controlled my working hours on HDC's premises and off-site at nights, weekends, and even holidays (Pl. Aff., ¶¶ 148-177, 197-203, 205-221, 370-390, 396-400, 401-422, 423-428, 437-439, 457-471, 576-582, 588-593, 609-621, 625, 639-640, 641-655).

89. I had filed my (my family) tax returns with the IRS for my HDC's incomes for year 2005 and 2006 as an employee of HDC pursuant to the IRS's Ruling in January 2007 and rules (Pl. Aff., ¶¶ 186-187).

90. There was no financial loss for me, as long as I have stayed in HDC's premises to carry out my assignments. There is no liability clause in the contract (Pl. Aff., ¶¶ 182-183).

91. All my earning incomes for year 2005 and 2006 had come from my work in HDC (Pl. Aff., ¶¶ 184, 204).

92. HDC had provided me a desktop in my office in HDC's premises (Pl. Aff., ¶ 188).

93. HDC had released a Laptop with all software installed and remote connection, a BlackBerry with service, and required me be available around the clock (Pl. Aff., ¶¶ 189-190).

94. HDC had also provided me stationery supplies, all other supplies and equipments, and remotely accessing to its system, the same as to other employees, such as Patibandla, in HDC (Pl. Aff., ¶¶ 191-192).

95. The relationship between I and HDC could be terminated by either party without incurring liability or penalty. It is the same as HDC's employment-at-will for its employee (Pl. Aff., ¶¶ 193-196).

96. Mariconda had arbitrarily changed my assignment to Patibandla at any time without my prior notice (Pl. Aff., ¶¶ 198, 470-471).

97. Mariconda, as my immediate, sole supervisor, had had total control on what, when, and how I perform my services at all time! (Pl. Aff., ¶ 200).

98. During the time period of my working for HDC, I had not had a place of business to perform similar services for others. There was no assistant for me to get, hire for my assignments assigned by Mariconda (Pl. Aff., ¶ 203).

99. There was no difference while Patibandla and I were dealing with other employees, such as business users, IT personnel to the extent of troubleshooting, technical supporting, and consultants and other personnel from various software venders (Pl. Aff., ¶ 205).

100. As an Apps/DBA, I had been performing daily services, as a key aspect of the HDC's integral, regular, daily business activities, with Patibandla alternately, overlapped, shared (Pl. Aff., ¶ 206).

101. HDC had treated Patibandla, who holding substantially similar position – Apps/DBA – as an employee from February 2005 to May 2006 (Pl. Aff., ¶¶ 209-210).

102. I was paid by HDC for my voir dire, the same as any employee in HDC (Pl. Aff., ¶ 217).

103. I was invited to, and participated in whole IT employees meetings. I was invited to, and participated in HDC Employees International Luncheon on Monday, October 17, 2005. I was invited to, and took part in the HDC's Employees Holiday Party (Pl. Aff., ¶¶ 219-221).

104.    I have earned dual Masters of Science from two of the oldest Engineering Graduate
Schools in the Unites States, MS in Computer Engineering in year 1992 from City
College of New York City University, and MS in Industrial Engineering in year 1989
from New Jersey Institute of Technology (Pl. Aff., ¶ 4).

105.    I have been working in IT (Information Technology) field for various institutions in
the United States of America since early 1990's, including as an employee employed by
Oracle Corporation, and CitiBank Corporation for many years (Pl. Aff., ¶ 5).

106.    While I had been employed by Oracle Corporation as her employee from 1998 to 2001,
I had contributed my extensive experience as an Oracle DBA / Apps/DBA by serving
numerous Oracle Corporation's customers, major multinational financial institutions, in
the United States and around the world (Pl. Aff., ¶ 6).

107.    The jobs I had implemented in Oracle Corporation had been, including, but not limited
to, capacity planning, benchmark testing, presentation, installation and configuration,
migration and upgrade, cloning, patching, troubleshooting, performance tuning,
monitoring, managing, backup and recovery, DR, scripting, automation, plus mentoring
Apps/DBAs of Oracle Corporations' customers (Pl. Aff., ¶ 7).

108.    I was awarded by CitiBank Corporation Council for my excellent accomplishment on
the IT project which I had designed, developed, tested, implemented and managed from
year 1995 to year 1998 (Pl. Aff., ¶ 8).

109.    I had been working, as an employee of HDC in the position of Apps/DBA, since
August 1, 2005 until June 21, 2006 when unlawfully terminated by HDC (Pl. Aff., ¶ 9).

110.    I had never heard of "Handbook" of HDC during my tenure in HDC. I was, first time,
aware of "Handbook" when Defendants delivered their first set of Production of
Documents on March 26, 2008 pursuant to the Court's Order (Pl. Aff., ¶¶ 10-11).

111.    I had started urgently and diligently to search for new employment immediately after
the unlawful termination by HDC. The quicker I get a new employment, the better it is for
me and my family well being and economically (Pl. Aff., ¶¶ 12-13).

112.    After continuously, diligently, and effortfully searching for substantially similar
employment, I had my first job offer in December 19, 2006. I started to work in January 2,
2007. I have been working as an Oracle DBA / Apps/DBA on larger scale, multi-tier,
RAC (Real Application Clusters), and much more sophisticated Oracle Applications
systems and other Oracle databases. I had been involved a multiple million dollars project

of migration and upgrade Oracle Application systems and other Oracle databases (Pl. Aff.,
¶¶ 14-19).

113.   Mariconda recognized my very well proven qualification on the position, Apps/DBA,
and my great contributions to HDC. "all the good work you've done. A welcome addition
to HDC. Your work and company[u] are appreciated" (Pl. Aff., ¶ 670).

114.   I had made production (Apps) system daily backup at almost perfect successful rate
after weeks troubleshooting, scripting, rescheduling, working with Microsoft Tech.
support and Choi. The production (Apps) system daily backup had been at more than 50
percent failed rate while Patibandla had been working on it for five month before I joined
HDC (Pl. Aff., ¶¶ 292, 320-325).

115.   I had superior problem-solving ability. I had effectively and timely resolved the issues
Mariconda had assigned to me from the very beginning to the very end of my tenure in
HDC. I had resolved one of severe major business interruption after Patibandla, Storozuk,
even the Engineers from Oracle Tech Support could not solve in many days (Pl. Aff., ¶¶
369, 370-395).

116.   On August 15, 2005, the production (Apps) system was hanging. I quickly found out
the problem and solved it. Shortly after Patibandla arrived at office, I updated him on the
issue and discussed how to prevent such problem from happening again. Patibandla
implemented the plan. I verified the result. And such problem had never happened again
to the production system (Pl. Aff., ¶¶ 326-337).

117.   I had effectively and timely worked with Oracle tech. Support and resolved the one of
Business Intelligent / OLAP performance issue in hours after Kar had been incapable of
dealing with such issue for over a week (Pl. Aff., ¶¶ 396-400).

118.   I had effectively worked with NetIQ and 170system software companies to point out
their defected, deficient designs in their software which HDC had deployed, via emails,
conference calls after I assigned to install and tune up performance for those systems with
the software (Pl. Aff., ¶¶ 486-495).

119.   I had successfully installed the Imaging system for test server in less than three weeks
after Patibandla gave it up by his failed many weeks' attempts and other IT member's
many months' failure (Pl. Aff., ¶¶ 532-545).

120.   I had improved the production Imaging system's scanning performance over 80 percent without users' PCs upgraded. LaSalle appreciated my timely, effective result in days for such years old issue with several upgraded PCs (Pl. Aff., ¶¶ 546-550).

121.   I had made it feasible for business users to review documents with long history in the production Imaging system without their PCs upgraded. Business users appreciated my effective, workable results. Meanwhile I figured out the design deficiency in the 170System's Imaging system software. Therefore I had save HDC tens thousands dollars from an enhancement contract signed with 170System prior several months ago (Pl. Aff., ¶¶ 551-566).

122.   All people, either IT members or Business users in HDC, had appreciated my effective, timely results on their issues Mariconda had assigned to me during my tenure in HDC. These people were listed in my Initial Disclosure and would be witnesses for the instant case at the trial (Pl. Aff., ¶¶ 454-357).

123.   Sivaprakasam had a problem with her development. Patibandla was incapable of solving it for her. Once she required my help, I solve it in hours for her with step-by-step explanation (Pl. Aff., ¶¶ 347-351).

124.   I had professionally provided my expertise suggestions and recommendations to HDC via meetings, emails, and conversations (Pl. Aff., ¶¶ 370, 385, 420, 426-427, 476, 494, 496-497, 508, , 539, 551-554, 575, 583, 603).

125.   I was assigned to setup a timesheet system for test server. I had scheduled a meeting and given a presentation with members of IT team for getting more specific information and requirements. I had successfully cooperated with them and setup the system (Pl. Aff., ¶¶ 477-481).

126.   At 4:30 p.m. I was told by Mariconda to refresh a database for Sivaprakasam, who was working from home, by the end of day. I finished it in hours by 7:45 p.m. (Pl. Aff., ¶¶ 524-525).

127.   It had taken several hours manually to fresh database in HDC. Once I was assigned to have daily refresh task, I suggested to Mariconda to make it automatic. I made scripts and scheduled a automatic refresh job in days. By 8:00 a.m. everyday, there had been refreshed database (Pl. Aff., ¶¶ 526-530).

128.   Shortly after such automatic refresh implemented, Mariconda called it off (Pl. Aff., ¶ 531).

129.   There were many BLUE SCREENS, fetal error which unexpectedly and uncontrollably shut down the production (Apps) system in HDC on the end of November, 2005, January 5, January 14 and 15, February 7, and February 12, 2006 (Pl. Aff., ¶¶ 401-402, 567-573).

130.   On February 7, 2006, Mariconda assigned me to have fresh installation a system and patch it up to the production (Apps) system patched level as soon as a new server setup by Lam (Pl. Aff., ¶¶ 403-406).

131.   Some days later, once the new server made available by Lam, Mariconda arbitrarily switched assignments to Patibandla. Patibandla could not carry out such assignment. Weeks later after I had resolved the one of severe issues on posterior patched production (Apps) system, I sent out an email of "Proposal for Cloning Oracle in New Server" on March 6, 2006 (Pl. Aff., ¶¶ 407-409, 421-422).

132.   Early next morning, Mariconda had a meeting without my prior notice, with me and Kulkarni, Choi in a conference room regarding my email of "Proposal for Cloning Oracle in New Server" (Pl. Aff., ¶¶ 410-420).

133.   I had calmly, professionally, effectively dealt with Mariconda's unprofessional, threatening, and discriminatory activities through the meeting, in addition to his emails prior night (Pl. Aff., ¶¶ 409-420).

134.   Patibandla had very unprofessional attitude towards me and overruled my assignments. I, calmly, professionally dealt with him and promptly reported issue to Choi, Kulkarni and Mariconda (Pl. Aff., ¶¶ 445-471).

135.   Once Patibandla claimed that there were several failed backups during routing App/DBA meeting, I calmly, professionally explained to him and later sent him detail the message. Patibandla spent most of day to understand information and realized he was wrong on it (Pl. Aff., ¶¶ 518-523).

136.   I was assigned by Mariconda to verify the Business Intelligent / OLAP system, plus to work with Malecki on the Imaging system migration on Saturday, May 13, 2006 for five hours, 9:50 a.m. to 14:55 p.m. I was required by Mariconda and worked on-site, HDC's premises on that day, Saturday, May 13, 2006 (Pl. Aff., ¶¶ 624-625).

137.   There were many outstanding, unsolved issues with newly migrated production (Apps) system in middle of May 2006 (Pl. Aff., ¶¶ 575-582).

138.    I had been taking care of all Apps systems, Imaging systems and other Oracle systems in HDC after Patibandla suddenly left HDC on May 17, 2006, in addition to mentoring Kar for his new role of Apps/DBA (Pl. Aff., ¶¶ 630-640).

139.    From May 18 to June 21, 2006, under my dedicated, professional, expertise managing all systems in HDC, there was no single unexpected, uncontrolled interruption for business in HDC (Pl. Aff., ¶¶ 630-640).

140.    On May 18, 2006, I and Tripp, a consultant from Oracle Support, applied a patch to one of Oracle databases. This patch is the same patch I had applied to other Oracle database in HDC more than seven months ago (Pl. Aff., ¶¶ 641-647).

141.    On May 23, 2006, I and Storozuk, a consultant from Oracle Support, applied the same patch to other Oracle database (Pl. Aff., ¶¶ 653-655).

142.    On May 23, 2006, I, together with Choi, had changed systems' passwords after Mariconda announced Patibandla was no longer with HDC prior day (Pl. Aff., ¶¶ 652, 656-657, 660-661).

143.    For next several days, I was assigned to apply the same patch to rest of all other Oracle databases in HDC, including the database was downgraded by Patibandla in September 2005 (Pl. Aff., ¶ 655).

144.    In early morning of May 24, 2006, I had a meeting with Mariconda in his office regarding to the matter of vacancy of Patibandla's, employee of HDC, Apps/DBA (Pl. Aff., ¶¶ 665-671).

145.    Minutes after the meeting, Mariconda sent out an e-mail of "Change of Roles" (Pl. Aff., ¶ 672).

146.    On the same day, I requested an appointment with McConnell, a sole EEO officer, Director of Human Resource of HDC, regarding the matter of the vacancy, my tenure in HDC, and the email of "Change of Roles". McConnell sent me a 30-minute appointment for next day (Pl. Aff., ¶¶ 674-678).

147.    I had reasonably and in good faith believed that Mariconda's decision to replace me by Kar for the vacancy of Apps/DBA of employee was unlawful discriminatory actions against me based upon my age (Pl. Aff., ¶ 680).

148.    I had reasonably and in good faith believed that Mariconda's decision to replace me by Kar for the vacancy of Apps/DBA of employee was unlawful discriminatory actions against me based upon my national origin (Pl. Aff., ¶ 681).

149.   I had reasonably and in good faith believed that Mariconda's disparate treatments between Patibandla, Kar, and me was unlawful discriminatory actions against me based upon my age, my national origin (Pl. Aff., ¶ 682).

150.   On May 24, 2006, Kulkarni and Kar could not find "missing" forms from the systems for several days. Once Lam told me and asked my help, I searched systems and found these forms in an hour or so (Pl. Aff., ¶¶ 360-362).

151.   On May 25, 2006, I and McConnell had an over an hours or so meeting in her office (Pl. Aff., ¶ 679).

152.   At the meeting, I complained to McConnell about Mariconda's discriminatory activities against me, because of my age, national origin, overlooking me on the vacancy (Pl. Aff., ¶¶ 683-712).

153.   On May 26, 2006, shortly after Patibandla's resignation, I initiated a whole production (Apps) system backup and worked together with Choi to implement it once Mariconda approved it. It was successfully completed on Saturday morning, the Memorial Day weekend (Pl. Aff., ¶¶ 583--587).

154.   At around 8:00 a.m., the Memorial Day weekend, Sunday, May 28, 2006, Mariconda phoned me and asked me to shut down servers in the HDC's Computer Room immediately. And for the following weekends, I had managed such shut downs to avoid overheat problem by automated the process based upon my scripts (Pl. Aff., ¶¶ 583--593).

155.   A day after the Memorial Day, Tuesday, May 30, 2006, at 4:24 p.m., Mariconda sent me an e-mail, subject: "consulting hours" (Pl. Aff., ¶ 714).

156.   On May 31, 2006, I had a meeting with Mariconda regarding to the matter of vacancy, his unlawful discriminatory actions and taking days off (Pl. Aff., ¶¶ 715-724).

157.   On June 1, 2006, at the outstanding issues-solving meeting, I figured out that the action plan by Oracle Support to execute the scripts was not executable for the HDC due to unsuitable to Windows platform (Pl. Aff., ¶ 598).

158.   On June 2, 2006, Mariconda presented a plan of Storozuk's services to HDC, which Storozuk sent to Mariconda on May 25, 2006 under request of Mariconda (Pl. Aff., ¶¶ 725-733).

159.   One of the listed things in Storozuk's plan was "Hands on mentoring for tn[t]e new Apps DBA" (Pl. Aff., ¶ 728).

160.   On June 5, 2006, Mariconda intentionally presented the plan of Storozuk's services to HDC again at the meeting with Kulkarni, Kar and me (Pl. Aff., ¶¶ 734-737).

161.   On June 6, 2006, I reported to Mariconda the issue with mandatory monthly Oracle Apps audit report from newly migrated production (Apps) system. I had worked with Oracle Tech. Support on the issue. On June 14, 2006 I provided suggested solution from Oracle tech. Support to Mariconda (Pl. Aff., ¶¶ 594-597).

162.   On June 7, 2006, I went to EEOC office at New York City and had consulted with a representative of EEOC on the matters I had encountered in HDC (Pl. Aff., ¶¶ 680-682, 738-746).

163.   On June 7, 2006, Kar could not do his assignment of solving a problem for a business user and asked my help. I solved the problem in 30 minutes before 5:00 p.m. (Pl. Aff., ¶¶ 363-365).

164.   On June 13, 2006, McConnell called me into her office and gave me feedback from Mariconda regarding to the matters I complained on May 25, 2006 (Pl. Aff., ¶¶ 747-761).

165.   On June 14, 2006, Mariconda resent an email to me on the matter of taking my days off (Pl. Aff., ¶ 762).

166.   On June 20, 2006 after I returned from my daughter's graduation ceremony in California during the weekend, I sent out an email regarding outstanding issues for posterior migrated production (Apps) system and my ongoing assignments (Pl. Aff., ¶¶ 765-769).

167.   Minutes later, Mariconda replied with "I am out today and unavailable" (Pl. Aff., ¶ 768).

168.   On June 21, 2006, Mariconda assigned me a new task to fix the problem in Production (Apps) system reported by Crotty (Pl. Aff., ¶ 776).

169.   The problem was caused by Kar's mistaken change to the production (Apps) system prior days. Kar is incapable of fixing it (Pl. Aff., ¶ 776-778, 786-788).

170.   During Apps/DBA meeting in that morning, Kar could not explained what he had spent over a week to patch up the system. Mariconda asked Kar to get further accurate information about his understandings on Apps system and adjourned the meeting (Pl. Aff., ¶¶ 769-771, 779-785).

171.   Whilst I was verifying the solution with Nagy on Crotty's issue, Mariconda interrupted me and took me into the office of McConnell (Pl. Aff., ¶¶ 786-788).

172.    Mariconda announced that he terminated my service in HDC immediately, based upon term of at-will in the "contract" (Pl. Aff., ¶¶ 789-794).

173.    Mariconda, in a minute, brought my bag into McConnell's office while I and McConnell were talking about Mariconda's unlawful retaliatory termination (Pl. Aff., ¶¶ 795-809).

174.    I would deal with unlawful discriminatory, retaliatory actions against me by Mariconda, HDC by all legal means. I requested a written statement for such unlawful retaliatory termination. McConnell contacted with upper manager immediately (Pl. Aff., ¶¶ 795-805).

175.    While I was sitting in front of my desk, packing my belongings, waiting for the termination letter with McConnell and/or Choi, Mariconda brought the Building Security guards, then NYPD police offers to the room (Pl. Aff., ¶¶ 811-837).

176.    Once I received and read the termination letter, I left HDC's premises (Pl. Aff., ¶¶ 841-842).


Dated: July 16, 2010

                                          Respectfully submitted,


                                          By:

                                          Steve Yu
                                          Plaintiff in Pro Se
                                          1025 Esplanade Ave. Apt. 4G
                                          Bronx, NY 10461
                                          (646)-639-3837

Via mail

To: Mr. Dean Silverberg                   To: Ms. Anna A. Cohen
    Epstein Becker & Green, P.C.               Epstein Becker & Green, P.C.
    250 Park Avenue                            250 Park Avenue
    New York, New York 10177                   New York, New York 10177

Case 07cv5541 (GBD) (MHD)                    AFFIRMATION OF SERVICE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
Steve Yu,

               Plaintiff,                                    07cv5541 (GBD) (MHD)

       -   against -
                                                              **AFFIRMATION OF SERVICE**

New York City Housing Development Corporation
(HDC), PELLEGRINO MARICONDA, Sued
herein in his Official and Personal Capacity,

               Defendant(s).
-------------------------------------------------------------------x

Steve Yu, Pro se Plaintiff,

TO THE PRO SE CLERK OF THIS COURT:

   I, <u>Steve Yu</u>, declare under penalty of perjury that I have served a copy of the attached <u>NOTICE OF MOTION OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>; <u>MOTION OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>; <u>AFFIDAVIT OF STEVE YU IN SUPPORT OF PRO SE PLAINTIFF'S MOTION OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>; <u>PRO SE PLAINTIFF'S RULE 56.1 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE</u>; <u>PRO SE PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>; and <u>LETTER TO HONORABLE JUDGE DOLINGER</u> upon <u>Mr. Dean Silverberg</u> and <u>Ms. Anna Cohen</u> whose address are <u>Epstein Becker & Green, P.C. 250 Park Avenue. New York, New York 10177</u> by mail.

Dated: JULY 16, 2010

                             By:
                                Steve Yu
                                Plaintiff in Pro Se
                                1025 Esplanade Ave. Apt. 4G
                                Bronx, NY 10461
                                (646) 639-3837

2010 JUL 19 P 4: 23
SDNY PRO SE OFFICE
RECEIVED