USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/16/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
STEVE YU,

                 Plaintiff,           :       **REPORT & RECOMMENDATION**

                                          :

             -against-             :       **07 Civ. 5541 (GBD)(MHD)**

                                          :

NEW YORK CITY HOUSING DEVELOPMENT
CORPORATION (HDC), <u>et</u> <u>ano.</u>,        :

                 Defendants.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:**


      <u>Pro</u> <u>se</u> plaintiff Steve Yu commenced this lawsuit in 2007,
alleging violations of numerous anti-discrimination statutes as
well as the Employee Retirement Income Security Act of 1974
("ERISA"), 29 U.S.C. § 1001 <u>et</u> <u>seq.</u> In short, he alleges that his
former employer, the New York City Housing Development Corporation
("HDC"), and his supervisor at HDC, Pellegrino Mariconda,
discriminated against him on the basis of his race, national
origin, and age by giving him unfavorable work assignments, denying
him a promotion to a position as a permanent employee, and
ultimately discharging him. He further alleges that HDC and
Mariconda unlawfully retaliated against him for complaining about
their discriminatory actions, and that he was denied the right to
participate in HDC's employee benefits programs, in violation of
ERISA. His complaint alleged claims under Title VII of the Civil

1

Rights Act of 1964, 42 U.S.C. § 2000e-1 <u>et</u> <u>seq.</u>; the Age
Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 <u>et</u> <u>seq.</u>;
various civil rights provisions in 42 U.S.C. §§ 1981, 1983, and
1985; and parallel New York State and City anti-discrimination
statutes, the New York State Human Rights Law, N.Y. Exec. Law § 290
<u>et</u> <u>seq.</u> ("NYSHRL"), and New York City Human Rights Law, N.Y.C.
Admin. Code § 8-107 ("NYCHRL"). His complaint also mentioned that
he had not been paid for his last ten days of work at HDC (Compl.
at ¶ 143), and we later deemed it amended to more explicitly
include a claim for unpaid wages "with accrued interest." (<u>See</u>
Endorsed Order, May 7, 2010; Letter from Steve Yu to the Court, May
7, 2010).


        <u>Procedural History</u>


    Yu's complaint, filed on June 11, 2007, originally sought back
pay, front pay, compensation for lost benefits, compensatory
damages, punitive damages, and damages for emotional distress and
physical injury. During the course of the litigation, Yu has either
dropped or been precluded from pursuing several of these remedies.
First, he chose to drop his claims for emotional distress and
physical injury in order to avoid the requirement that he provide
documents pertaining to any psychological, psychiatric, or medical

2

history or treatment. (Order dated Apr. 9, 2008). Second, after Yu failed to comply with a series of discovery orders requiring him to produce documents or answer interrogatories relevant to his claims for damages, we precluded him from seeking or recovering either back pay or front pay. Yu v. New York City Hous. Dev. Corp., 2010 WL 1142062, at *1 (Mar. 25, 2010) (Order adopting in part and rejecting in part Report & Recommendation). At the same time, we precluded plaintiff from using any documents sought by defendants in discovery and withheld by him to establish any part of his claim, either on a subsequent summary judgment motion or at trial. Id.; see also Yu v. New York City Hous. Dev. Corp., 2010 WL 1141196, at *7 (Feb. 23, 2010) (Report & Recommendation). These documents included

> (1) contemporaneous notes that plaintiff had concededly made concerning his work (which we held were not protected by work-product immunity); (2) documents to which the complaint specifically referred; (3) documents concerning plaintiff's consulting relationship with HDC; (4) documents reflecting plaintiff's claimed damages; (5) documents pertaining to the allegations in his complaint (even if not specifically referenced in that pleading); (6) documents reflecting plaintiff's post-termination job searches, as well as a job-offer letter from an entity known as Graphnet; (7) redacted tax returns and Form 1099s for 2005 through 2007 (the redactions to exclude any non-earned income); and (8) documents relating to the terms of plaintiff's most recent employment.

3

Yu, 2010 WL 1141196, at *2.[1] While we recognized that this would "largely eviscerate the heart of plaintiff's case," id. at *8, we also noted that his claims "for denial of a promotion . . . [and] that defendants failed to pay him his salary for the last few weeks that he was employed" survived. Id. at *7. His claim for denial of benefits under ERISA likewise survived. Id. at *7 n.3. Defendants have now moved for summary judgment on these claims.[2]

As a preliminary matter, we note the effect of the various discovery disputes -- and plaintiff's apparent failure to depose any witnesses (see Tr. of May 8, 2008 Pre-Trial Conf. at 7-8) -- upon our consideration of defendants' motion. "It is well established that . . . the district court[,] in awarding summary judgment, may rely only on admissible evidence." Estate of Hamilton v. City of New York, 627 F.3d 50, 53 (2d Cir. 2010) (quoting Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir. 2010)). In support of their motion, defendants have submitted several declarations

---

[1] Plaintiff did ultimately produce a Form 1099 for 2007. Yu, 2010 WL 1141196, at *4.

[2] Plaintiff's opposition to this motion contains no reference to discrimination based on his race, and apparently rests entirely on allegations of age and national origin discrimination. We therefore consider his claim of race discrimination to be abandoned, and recommend that defendants be granted summary judgment on his claims insofar as they originally alleged discrimination on the basis of race.

4

with exhibits, as well as a statement of undisputed facts pursuant to Local Rule 56.1. Plaintiff has also submitted a Rule 56.1 Statement, as well as an affidavit supported by several exhibits. He avers that these exhibits are culled from his own initial disclosures and defendants' document production. (Pl.'s Aff. at p. 82). As such, they are not within the scope of our preclusion order, and we may consider them on the present motion. Where possible, we will cite to the portions of these exhibits that were apparently produced by defendants -- those with Bates stamps beginning with the letter "D" -- in order to ensure that we do not inadvertently rely upon any documents referenced in violation of our sanctions order.[3]

Large sections of plaintiff's affidavit and his Local Rule 56.1 Statement consist of conclusions of law or conclusory, self-serving statements about defendants' actions. (<u>See</u>, <u>e.g.</u>, Pl.'s Rule 56.1 Statement at ¶ 6 ("[Plaintiff] was unlawfully terminated by Defendants . . . ."); Pl.'s Aff. at §§ 53-54 ("Mariconda had conducted unlawful discriminatory activities again [sic] me . . . Mariconda had violated my constitutional, federal projected [sic] rights under color of state law in his individual and official

---

[3] We will also, where appropriate, cite to the declarations and supporting exhibits submitted by defendants.

capacities. Mariconda had unlawfully retaliated against, terminated me [sic] . . . .")). While we have no doubt that the plaintiff believes that these allegations are true, we need not credit them based solely on his ipse dixit. See, e.g., Bellsouth Telecomms., Inc. v. W.R. Grace & Co.-Conn., 77 F.3d 603, 615 (2d Cir. 1996) (upholding decision to disregard "self-serving conclusions" contained in an affidavit opposing summary judgment). Moreover, to the extent that the statements contained in plaintiff's affidavit are not based on his personal knowledge or potentially admissible attached exhibits, they are not admissible as evidence and we need not consider them. See Mattera v. JPMorgan Chase Corp., ___ F.Supp.2d ___, 2010 WL 3785576, at *7 (S.D.N.Y. Sept. 30, 2010) (citing H. Sand & Co. v. Airtemp Corp., 934 F.2d 450, 454-55 (2d Cir. 1991)) ("Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial."). Thus, where we cite to plaintiff's affidavit, we do so only for two categories of statements: (1) factual statements by the plaintiff to which he could ultimately testify based on personal knowledge, which are therefore potentially admissible as evidence, see Fed. R. Evid. 602; or (2) to show a dispute between the parties.

Similarly, several paragraphs of plaintiff's Rule 56.1

Statement refer to facts that are actually in dispute or that are contradicted by evidence in the record. For example, plaintiff goes on at length about the qualifications -- or, more pertinently, the alleged total lack thereof -- of two employees of HDC, each of whom held the position to which plaintiff contends he would have been promoted if not for defendants' discriminatory actions. (See Pl.'s Rule 56.1 Statement, at ¶¶ 20-23, 26-32, 36, 38-44, 46). In response, defendants point to the resumes of each of these employees, which at the very least raise an issue of fact as to their qualifications. (See Decl. of Pellegrino Mariconda in Supp. of Defs.' Mot. for Summ. J. ("Mariconda Decl.") at ¶ 19, Ex. 10; Decl. of Mary McConnell in Reply to Pl.'s Opp'n and in Further Supp. of Defs.' Mot. for Summ. J. ("McConnell Reply Decl.") at ¶ 9, Ex. 7). Hence, rather than relying exclusively on either of the parties' Rule 56.1 Statements, we will examine the evidence that they have submitted to determine whether it shows the presence or absence of any genuine disputes of material fact. "However, where a stated fact [in a Rule 56.1 Statement] is nowhere controverted, it will be deemed admitted." Jessamy v. City of New Rochelle, New York, 292 F.Supp.2d 498, 505 (S.D.N.Y. 2003) (quoting Williams v. R.H. Donnelley, Inc., 199 F.Supp.2d 172, 173 n.1 (S.D.N.Y. 2002)); see also Schultz v. Incorporated Village of Bellport, 2010 WL 3924751, at *1 n. 1 (E.D.N.Y. Sept. 30, 2010) (citing cases)

("Accordingly, in the exercise of its broad discretion [regarding compliance with local court rules], the Court will overlook this defect and will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record."). Thus, where a fact contained in one of the parties' Rule 56.1 Statements is undisputed or the opposing party has pointed to no evidence in the record to contradict it, we will cite to the Rule 56.1 Statement without further explanation.[4]

The Factual Record

A.    The Parties

Defendant HDC is a public benefit corporation and was formed by the State of New York in 1971 to increase the supply of affordable housing in New York City. (Defs.' Rule 56.1 Statement at ¶ 1; Pl.'s Rule 56.1 Statement at ¶ 21). Defendant Mariconda is currently the Senior Vice President of Administration and the Chief Information Officer ("CIO") of HDC. (Defs.' Rule 56.1 Statement at

---

[4] Defendants have submitted a Reply to Pl.'s Rule 56.1 Statement, in which they note that, for purposes of this motion, they do not dispute several of plaintiff's contentions of fact. (See generally Defs.' Reply to Pl.'s Rule 56.1 Statement).

¶ 2). He has held the position of CIO since June 2005. (Mariconda Decl. at ¶ 2). In his capacity as CIO, he supervises HDC's Information Technology ("IT") Department. (Defs.' Rule 56.1 Statement at ¶ 3).

Mariconda interviewed plaintiff Steve Yu for a position as an Oracle Database Administrator ("DBA") in the summer of 2005. (Id. at ¶ 4; Pl.'s Rule 56.1 Statement at ¶ 4). At the time, Yu had approximately twelve years of experience working as an Oracle developer and DBA, including approximately three years as a Senior Oracle DBA at Oracle Corporation itself. (Pl. Ex. J, at D000024-25; Pl.'s Rule 56.1 Statement at ¶¶ 105-08). He also had two Master's degrees -- one in computer science and information technology from City College New York, and one in industrial engineering and operational research from New Jersey Institute of Technology. (Pl. Ex. J at D000025; Pl.'s Rule 56.1 Statement at ¶ 104). His resume states that, from 2001 until he accepted work at HDC, he had been working as a freelance Oracle consultant. (Pl. Ex. J at D000025). At plaintiff's second interview, Mariconda offered him the DBA position. (Defs.' Rule 56.1 Statement at ¶ 4; Pl.'s Rule 56.1 Statement at ¶ 4; Pl. Dep. 115:3-116:18).

Plaintiff began working as an Oracle DBA in HDC's IT

9

Department on August 1, 2005. (Defs.' Rule 56.1 Statement at ¶ 4;
Pl.'s Rule 56.1 Statement at ¶ 4). On the same day, plaintiff
signed a Consulting Agreement with HDC. (Id. at ¶ 7; see also Decl.
of Mary McConnell in Supp. of Defs.' Mot. for Summ. J. ("McConnell
Decl.") at ¶ 8, Ex. 5). Plaintiff contends that Mariconda told him
at his interview that he would initially be hired as a
"consultant", but that he would be given a position as an employee
of HDC when a vacancy for an employee position became available.
(Pl.'s Aff. at ¶¶ 279-280). Mariconda, however, states that he
"offered Plaintiff a position at HDC as a consultant . . . [but]
did not guarantee Plaintiff that his status would change from
contractor to employee." (Mariconda Decl. at ¶ 5).

Yu was terminated on June 21, 2006. (see Defs.' Rule 56.1
Statement at ¶ 6, Pl.'s Rule 56.1 Statement at ¶ 6). At the time,
Mariconda listed the reasons for his termination, stating that
plaintiff:

> - Spoke to individuals (myself, Madhavi Kulkarni, Farina
> Cocker and Shiv Kar) unprofessionally[;]
>
> - Did not complete his projects which are detailed out every
> Monday during our weekly DBA meeting which includes myself,
> Madhavi and Shiv Kar[;]
>
> - Did not work well with others, especially those working on
> projects with him[;]
>
> - Did not verbally communicate well[;]

10

- Did not follow instruction[s] well and often delineated [sic, deviated] from his assigned tasks. While de[vi]ating from his assigned tasks, he questioned the responsibilities and work of others instead of completing his own work[.]

(Mariconda Decl. at ¶ 17, Ex. 9; Pl.'s Ex. G, at D000016).

While plaintiff was employed in HDC's IT Department, it consisted of employees and consultants of the following races: seventeen Asian, four White, one Hispanic, and one Black. (Defs.' Rule 56.1 Statement at ¶ 14). HDC does not maintain records of employees' national origin. (Id.). When Yu began working at HDC, he was 49 years old; when he left, he was 50 years old. (Defs.' Rule 56.1 Statement at ¶ 6). He is Asian and of Chinese national origin. (Id. at ¶ 5; Pl. Dep.[5] 22:4-12)).

B.   Yu's Agreement With HDC

Yu's Consulting Agreement lists his duties as an Oracle DBA, which, broadly speaking, were to optimize, maintain, and troubleshoot HDC's Oracle computer systems. (See McConnell Decl. at Ex. 5, § 3). Yu agreed to hold himself available to provide these

---

[5] Plaintiff provided several pages from his own deposition as Exhibits H and I to his Opposition. Where his deposition is cited without further explanation, the citation is to those exhibits. Pages 100-230 of plaintiff's deposition may be found in Exhibit H, and pages above 230 may be found in Exhibit I.

services to HDC "on a non-exclusive basis." (<u>Id.</u> at Ex. 5, third
para.; <u>see</u> <u>also</u> Defs.' Rule 56.1 Statement at ¶ 10). The Agreement
also lists in detail the terms of Yu's employment with HDC. It
specifically states that Yu "is acting as an independent contractor
and not as an employee of HDC in performing his services" under the
Agreement. (McConnell Decl. at Ex. 5, § 5). It also states that it
will commence on August 1, 2005, and end on August 1, 2007,
although either party had the right to terminate the agreement "at
any time for any reason or no reason." (<u>Id.</u> at Ex. 5, § 2). Under
the Agreement, Yu would be paid sixty dollars per hour for his
services, up to a maximum aggregate amount of $124,000. (<u>Id.</u> at Ex.
5, § 4). Although the contract ran for two years, that amount would
be exhausted after approximately one year of full-time work. (<u>Id.</u>
at ¶ 10).

Yu agreed to provide timesheets to HDC listing his hours
worked. (<u>Id.</u> at Ex. 5, § 4). He also agreed that he would not be
reimbursed for any expenses he incurred in performing his services
for HDC. (<u>Id.</u> at Ex. 5, § 11). HDC agreed to pay Yu without
withholding any amount for income taxes, Social Security,
unemployment insurance, or "any other contributions or benefits
which might be expected in an employer-employee relationship." (<u>Id.</u>
at Ex. 5, § 5). Yu agreed to report and pay any taxes and

12

contributions for these "and other benefits" for himself. (<u>Id.</u>).
Pursuant to these provisions, HDC reported Yu's income for 2005 and
2006 to the IRS on Form 1099, and provided Yu with copies of these
forms. (Defs.' Rule 56.1 Statement at ¶ 8; <u>see also</u> McConnell Reply
Decl. at ¶ 2, Ex. 1). HDC provided Yu's 2005 Form 1099 in response
to a document request. (<u>See</u> Pl.'s Ex. N, at D000280). Yu admits
that he received a Form 1099 for his income from HDC (Pl.'s Aff. at
¶¶ 185-87), although he also contends that he filed taxes as an
employee of HDC rather than as an independent contractor and that
HDC must have paid taxes for him as such.[6] (Pl.'s Rule 56.1
Statement at ¶¶ 8-9; Pl.'s Aff. at ¶¶ 187).


          Yu admitted at his deposition that he did not attempt to
negotiate over the terms of the Consulting Agreement, and that he
did not read it before signing it. (Pl. Dep. 126:15-127:24). Aside

---

[6] As defendants note, Yu refused to submit his tax returns or
1099s for 2005 and 2006, and he is therefore precluded from
presenting evidence on this point beyond his affidavit. (<u>See</u>
Defs.' Reply to Pl.'s Rule 56.1 Statement, at p. 4 (citing <u>Yu</u>,
2010 WL 1141196, at *2, *7)). We take plaintiff's contention that
HDC "must have paid tax[es] for my income in year [sic] 2005 and
2006 pursuant to the IRS's Ruling and rules" (Pl.'s Rule 56.1
Statement at ¶¶ 8, 9) to be a reference to the IRS's
determination that plaintiff was in fact an employee for
employment tax purposes. (<u>See</u> Pl.'s Ex. M, at ID000203-07). This
determination was part of plaintiff's initial disclosures (<u>see</u>
Pl.'s Aff. at p. 82), and hence we may consider it on this
motion.

from his compensation and duties, the terms of Yu's contract were essentially identical to those contained in several other Consulting Agreements with other members of the HDC IT Department. (Compare McConnell Decl. at Ex. 5 (plaintiff's contract) and Pl.'s Ex. F at D000022 (HDC Contract Approval Form for contract with Steve Yu on "Consulting Project for Oracle") with Pl.'s Ex. F at D000355-56, D000360 (Contract between HDC and Irene Yau and Contract Approval Form for same), Pl.'s Ex. F at D000424 (Contract Approval Form for contract with Raju Thomas on "Consulting Project for Oracle"), Pl.'s Ex. F at D000439, D000442, D000500, D000509 (Contract between HDC and Quest America, Inc.; Contract Approval Forms for same, with contacts listed as Vijay Pandu and Manimegalai Sivaparkasam), Pl. Ex. F at D000524, D000526 (Contract between HDC and Deepa Goel.; Contract Approval Form for contract with Deepa Goel on "Oracle Computer Project")).

Over the course of his employment with HDC, plaintiff worked an average of thirty-five to forty hours per week. (Defs.' Rule 56.1 Statement at ¶ 13; Pl.'s Rule 56.1 Statement at ¶ 13). His hours varied, however, based on his pending assignments and the fact that HDC's computer systems sometimes required extensive troubleshooting outside normal business hours. (Pl.'s Rule 56.1 Statement at ¶ 13; see also, e.g., Pl.'s Aff. at ¶¶ 583-93

14

(discussing an incident where plaintiff was required to respond to an emergency situation at HDC during the weekend)). While plaintiff's contract with HDC was on a non-exclusive basis, he alleges that he was unable to work for any outside employer while performing his duties for HDC, given the amount of time that his work for HDC required. (Pl. Dep. at 145:17-146:3[7]).

HDC provided plaintiff with a laptop and Blackberry to enable him to work from home, particularly on occasions where he was required to respond to emergencies. (Pl. Dep. at 140:2-15). HDC also provided plaintiff with a desktop computer to be used at the office, as well as stationary and other office supplies. (Pl.'s Rule 56.1 Statement at ¶¶ 92, 94). Plaintiff did not return the laptop and Blackberry after his termination. (Id. at 140:15-22). Although plaintiff occasionally did work from home (see Pl. Dep. at 150:5-17), he usually worked at HDC's office from 8 a.m. to 5 p.m. on business days. (Pl. Dep. at 142:10-11, 17-25[8]). Mariconda asked plaintiff to work these hours because Rao Patibandla, another Oracle DBA at HDC, usually arrived between 9:30 and 10:30 a.m. and

---

[7] These pages of plaintiff's deposition is attached as Exhibit D to the Declaration of Dean L. Silverberg, Esq., in Supp. of Defs.' Mot. for Summ. J. ("Silverberg Decl.").

[8] Silverberg Decl. at Ex. D.

15

left later in the evening, and Mariconda wanted the two DBAs to "overlap for longer hours." (Pl. Dep. at 142:13-23[9]).

        C.   Yu's Employment History at HDC

A substantial portion of plaintiff's submitted materials deal with the technical work performed by plaintiff, Patibandla, and Shiv Kar (another member of HDC's IT Department). (See generally Pl.'s Rule 56.1 Statement at ¶¶ 14-58, 81-139, 150-161, 163). These statements, taken together, are clearly crafted to raise the inference that plaintiff was the only truly competent member of HDC's IT Department, that Patibandla and Kar were simply unqualified to hold the position to which plaintiff aspired to be promoted, and that these facts were so obvious that Mariconda's failure to promote plaintiff over either Patibandla or Kar was transparently discriminatory.[10] As Patibandla and Kar were of a different national origin from plaintiff -- both were of Indian national origin (Pl's Rule 56.1 Statement at ¶ 14) -- these

---

[9] Silverberg Decl. at Ex. D.

[10] Plaintiff's failure-to-promote claim is somewhat opaque, since he held the same title as both Patibandla and Kar. His claim, however, is not premised on his title or job responsibilities, but on the fact that Patibandla and Kar were permanent employees of HDC, whereas his position had a defined end date.

statements seem designed to raise an inference of discrimination based on national origin. Plaintiff also states that Mariconda -- who was responsible for delegating assignments among the members of the IT Department (see, e.g., Pl.'s Ex. D at D000701, D000705, D000712-13, D000716-17) -- regularly assigned more interesting projects to Patibandla, and routine daily tasks to him, which we take to mean that Mariconda (and HDC) discriminated against him by giving him unfavorable work assignments. (Id. at ¶ 81).

Plaintiff's submissions about his relationship with Patibandla reflect his belief that Patibandla was entirely unqualified to hold the position of Oracle DBA or Oracle Applications DBA ("Apps/DBA"). (See generally id. at ¶¶ 33-58). Plaintiff makes numerous statements to the effect that Patibandla was incapable of performing basic tasks required of an Oracle DBA or Apps/DBA (at least without substantial help from technical support); that he would frequently begin performing tasks, realize that he could not complete them, and give up; that plaintiff himself could quickly and easily perform tasks that Patibandla could not complete; and that Mariconda would arbitrarily reassign tasks from Patibandla to plaintiff or vice versa. (See generally id. at 36, 38-51, 79-83). Plaintiff also asserts that Patibandla's demeanor and communication skills were lacking, and that Mariconda refused to discipline him

17

for his unprofessional behavior. (<u>Id.</u> at ¶¶ 52-56). Plaintiff's assertions about Patibandla can be boiled down to his statement that "the only qualifications for Patibandla being an Apps/DBA of HDC's employee [sic] were his age, of [sic] his Indian national origin." (<u>Id.</u> at ¶ 56).[11]

The documents submitted by the parties tell a slightly different story.[12] Most pertinently, Patibandla's 2006 Appraisal -- which covers Patibandla's work during 2005 -- repeatedly praises his level of technical knowledge and notes that he stabilized several of HDC's systems, each of which had been crashing on a daily or near-daily basis when he joined the agency. (<u>See</u> <u>generally</u> McConnell Reply Decl. at Ex. 8). For example, the appraisal form lists one of Patibandla's job responsibilities as "Stabilize Timesheet Production System." (<u>Id.</u> at D001440). Patibandla's self-appraisal of the project states that the "Timesheet application is stable and did not crash even once since we went live," and Mariconda's evaluation of Patibandla's work on the project states

---

[11] Patibandla is of Indian national origin (Pl.'s Rule 56.1 Statement at ¶ 34), and was hired at the age of thirty-five. (<u>Id.</u> at ¶ 33).

[12] We are forced to rely on documentary evidence to evaluate Patibandla's qualifications, since plaintiff did not depose Patibandla or any other individuals who might have been able to testify about his technical abilities.

that "The timesheet application should be held up as a model to any
project." (Id.).

     Patibandla's appraisal is not uniformly positive; for example,
Mariconda rated Patibandla's technical skills as "good," but stated
that "he needs to be better on the Oracle Applications maintenance
side." (Id. at D001443). Mariconda also stated that he "would like
[Patibandla] to take more of a leadership position on varying
projects but to do so he needs to communicate better and have a
more organized approach towards tackling issues." (Id.). Patibandla
noted his disagreement with this evaluation of his communication
and leadership skills in a handwritten addendum to the appraisal
form. (Id. at D001444-45). Nevertheless, he signed the form on
March 10, 2006, as did Mariconda. (Id. at D001444).

     Patibandla began working as HDC's Oracle DBA in February of
2005. (Pl.'s Rule 56.1 Statement at ¶ 33). At the time, he had
approximately nine years of experience as an Oracle DBA. (See
McConnell Reply Decl. at ¶ 10, Ex. 7). When plaintiff joined HDC in
August of 2005, Patibandla still held the position of Oracle DBA;
in fact, plaintiff's first assignment was to "[w]ork with
[Patibandla] on knowledge transfer." (See Pl.'s Ex. D at D000701).
Conversely, Patibandla's assignment when plaintiff was hired was to

"[b]ring new hire, [S]teve, up to speed." (Id.). Mariconda sent
Patibandla and plaintiff a detailed email listing exactly what this
assignment would involve. (Pl.'s Ex. L at D000700).

   The first indication in the record of any conflict between Yu
and Patibandla (or any allegation by Yu of inadequate performance
on Patibandla's part) comes less than two months after plaintiff
joined HDC. On September 22, 2005, Yu sent an email to Mariconda
and Patibandla entitled "Recap of the Meeting." (Pl.'s Ex. J at
D000772). In that email, Yu listed several projects that he
intended to work on during the following week. (Id. ("Here is my
part of works for our doing and us to do [sic] in this week and
next week.")).

   Yu testified at his deposition that, on the morning of the
following day, Patibandla received an assignment from Mariconda
(Pl. Dep. at 264:17-265:16) and immediately emailed Yu and told him
to take the assignment. (Id. at 265:17-22). Yu refused to take on
the assignment, apparently because he believed that only Mariconda
had the authority to assign projects to him. (Id. at 265:23-267:8;
see also id. at 258:2-5 ("[Mariconda]'s the only supervisor in the
HDC for me working in the HDC [sic]. Nobody going to assign me no
without Mr. Mariconda's approve [sic] or anything like that.")).

20

This led to an argument between Yu and Patibandla. (Id. at 267:9-268:15). Mariconda was not in the office at the time,[13] so plaintiff initially discussed the argument with Ping Choi and Madhavi Kulkarni,[14] who were supervisors of the IT Team[15] during Mariconda's absence. (Id. at 271:2-7; see also Pl.'s Ex. J at D000064 (email from Mariconda to IT Team (Aug. 30, 2005) ("As always, in my absence Madhavi and Ping are the final voice on any burning issues."))). Plaintiff testified that he then emailed Mariconda about the issue, sending a copy of the email to Choi and Kulkarni. (Pl. Dep. at 272:21-273:4). None of the parties attached this email to their submissions on this motion, although plaintiff did attach an email saying that he had forwarded one of Mariconda's prior emails to Choi and Kulkarni. (Pl. Ex. J at D000773). The prior email is not attached, but it appears from the time stamp that it

---

[13] Plaintiff makes no attempt to reconcile his assertions that Patibandla received an assignment from Mariconda on September 23rd and that Mariconda was out of the office and unavailable on that date.

[14] Ping Choi was the Senior Network and Server Administrator and the LAN Project Manager at HDC. (Pl.'s Ex. N at D000733). Madhavi Kulkarni later became HDC's Deputy CIO, although she did not hold that title until December of 2005. (Id.; see also Pl.'s Aff. at ¶ 124). Kulkarni is of Indian national origin (Pl.'s Aff. at ¶ 123), and was thirty-five years old when plaintiff was hired, and thirty-six when he was fired. (See id. at ¶ 121). We received no information on Choi's age or national origin.

[15] Since several of the submitted documents refer to those working in the IT Department as the "IT Team", we do the same.

was a blank forward of a September 23, 2005 email from Patibandla
to Yu.

    That email -- sent from Patibandla to Yu just before 5:00 p.m.
on Friday, September 23, 2005 -- responds to plaintiff's "Recap of
the Meeting" email from the previous day. (Pl. Ex. J at D000775).
In it, Patibandla stated that he was working on four of the listed
projects, and asked Yu to work on the remainder. (Id.). Mariconda
responded via email to both Yu and Patibandla less than five
minutes later, stating that he was "relying [on] YOU guys to
balance out the load of work. We seemed to be on the SAME page
yesterday during and after our meeting. Let's meet again on
[M]onday." (Id. at D000774). On Friday evening, after Yu had
emailed Mariconda in response, Mariconda emailed Yu to say, "Don't
worry about anything at all. Your work and companyu [sic] are
appreciated. I have a big team and expect conflicts here and there.
Not to worry." (Id. at D000773). Shortly after this email was sent,
Yu replied: "THANK YOU." (Id.).

    Yu testified at his deposition that he had indeed met with
Mariconda and Patibandla the following Monday, and that at the
meeting, he stated that he would have no trouble working with
Patibandla, but asked for (and received) clarification that he

would only take assignments from Mariconda, not Patibandla. (Pl. Dep. at 273:16-274:21). Despite this apparently amicable resolution of the issue, plaintiff testified that, from that point forward, Mariconda's attitude toward him changed for the worse. (Id. at 263:3-22).

Despite plaintiff's statement that Mariconda's attitude towards him altered in many ways, and that he could "give . . . lots and lots of examples" of the changes (id. at 277:13-15), plaintiff was incapable of pointing to any specific changes other than the fact that, just after the meeting, Mariconda took Patibandla's suggestions about the division of assignments between the two DBAs. (Id. at 263:3-22, 274:22-277:18). In fact, Yu also testified that in early October of 2005 -- less than a month after Mariconda's attitude towards him purportedly changed for the worse -- Mariconda gave him a gift of espresso. (Pl. Dep. at 167:2-17[16]). Mariconda did so after the two discussed the fact that Yu drank large amounts of coffee and preferred strong coffee. (Id.). As a return gift, Yu gave Mariconda a tie. (Id. at 18-25).

Moreover, Mariconda submitted numerous emails that he sent to

---

[16] Silverberg Decl. at Ex. D.

23

plaintiff thanking him for his work on various projects, dating from August 30th, 2005, December 21st, 2005, February 16th and 20th, 2006, and June 2nd, 2006. (Mariconda Decl. at Ex. 8).[17] These emails show no change in tone after September 23rd, 2005.

Plaintiff also submitted several emails between himself and Mariconda (as well as the rest of the IT Team) as exhibits to his opposition, and these show no significant changes in tone after September of 2005. Both before and after that date, Mariconda frequently took issue with plaintiff's poor communication, which manifested itself in plaintiff's habit of communicating primarily by email (see Mariconda Decl. at ¶ 10) and his frequent failure to email the relevant members of the IT Team about projects. For instance, on August 15, 2005, plaintiff claims that he noticed a problem with HDC's production system and was able to solve it quickly after a brief period of troubleshooting. (Compl. at ¶ 32). He then emailed Mariconda, Patibandla, and Kulkarni to explain the problem and his solution. (See id. at ¶ 33; see also Pl.'s Ex. F, at D000769). Mariconda forwarded the email to the entire IT Team as an FYI. (Pl.'s Ex. F, at D000769). This was the first of many instances in which Mariconda either asked plaintiff to discuss

---

[17] As with Patibandla, plaintiff did not depose Mariconda. We thus rely on documents for our evaluation of his attitude.

things with other members of the IT Team (either by email or by
directly speaking to them) or played the role of middleman,
forwarding plaintiff's communications to the appropriate recipient.
A list of similar events follows:

- On October 2, 2005, plaintiff emailed Mariconda, Patibandla,
Kulkarni, and Choi to inform them that he was changing the
schedule for that night's backup of one of HDC's Oracle
servers. Mariconda responded, "I hope [yo]u spoke to [R]ao
[Patibandla] about this. The last we left it was that [R]ao
was takintg [sic] care of everything. Please call him[.]"
(Mariconda Decl. at Ex. 6).

- On October 11, 2005, plaintiff emailed Mariconda, Choi, and
Michael Lam to inform them that one of HDC's Oracle servers
had been successfully backed up over the weekend for the first
time in months. Mariconda replied to plaintiff, saying,
"Please cc Rao [Patibandla] on this." (Pl.'s Ex. G at
D000210).

- On December 1, 2005, plaintiff emailed Mariconda and Choi to
ask whether he should implement a backup of HDC's Oracle
servers that evening as scheduled. Mariconda responded, "Yes

25

. . . I have cc'ed Rao [Patibandla.] Please get into the habit of cc'ing other IT members on relevant projects[.] I may be the person that says yes or no but having others knowledgeable of what is goi[n]g in is just as important." (Pl.'s Ex. D at D000794).

- On February 19, 2006, there were a series of emails between plaintiff, Mariconda, Patibandla and Kulkarni, in which Mariconda twice asked plaintiff to call other members of the team and speak about the then-ongoing project rather than emailing. (Mariconda Decl. at Ex. 4).

Plaintiff's email from August 15, 2005 also appears to reflect the first time -- though not the last -- that plaintiff performed a task not assigned to him. While on that occasion, his actions were appreciated, his habit of deviating from his assigned tasks frequently led to additional communications problems with other members of the IT Team and other deleterious results. Again, examples from the parties' submissions follow:

- On December 1, 2005 -- just before 3:00 A.M. -- Mariconda was informed that another member of the IT Team, Manimegalai Venkatesh, "experienced some hardware issues with the server

26

which delayed [Venkatesh] completing the fix." (Mariconda
Decl. at Ex. 3, D000201). He informed several members of the
IT Team that, as a result, the Oracle server had not been
backed up, and that it would be down for a period of time over
the coming weekend for a manual backup. (Id.). Mariconda asked
the IT Team to "let us know when we can have the server
between Friday [and] Sunday." (Id.). Mariconda forwarded his
email to plaintiff to inform him of the need to re-run the
nightly Oracle server backup. (Id.). Just before 6:30 A.M.,
plaintiff emailed Mariconda to ask if he should "start to
backup Oracle now, because we have not backup [sic] early this
morning?" (Id. at D000200). He then stated that he was
available to monitor the backup if it started immediately.
(Id.). Mariconda responded at 7:00 A.M., saying, "I hope
thi[s] wasn't done[.] Please read your email[.]" (Id.).
Plaintiff replied at 8:39 A.M., saying, "The Oracle just keeps
running." (Id.). Mariconda responded ten minutes later,
saying, "What does this mean????" (Id.).

- On March 6, 2006, plaintiff emailed several members of the
IT Team to propose a new project, which he would take the lead
on: cloning Oracle to a new server, which plaintiff suggested
could make migration of another of HDC's servers

27

"significantly faster."[18] (Pl.'s Ex. G at 000715). His proposal suggested new tasks for Patibandla and another member of the IT Team, Michael Lam.[19] (Id.). The email informed the IT Team that "[w]e will discuss this in detail during the meeting." (Id.). Just after 8:00 A.M. the following day, Mariconda responded to plaintiff's email, telling him to "[r]eassign this call to Rao [Patibandla]." (Id.).

- Also on March 6, 2006, Shiv Kar, another member of the IT Team, sent a long, detailed technical email entitled "Diagnosing and Resolving ORA-4030 errors" to plaintiff, Mariconda, Patibandla, Kulkarni, and Choi. (Pl.'s Ex. G at D001288-94). Mariconda responded by email, saying, "Let's all meet to discuss this issue again. Please stop by." (Id. at D001288). That evening, just after 10:00 P.M., plaintiff sent another detailed technical email in reply, entitled "ORA-4030 errors coming from apps tier processes." (Mariconda Decl. at Ex. 5, D000166-71.). Mariconda responded less than five

---

[18] The complaint suggests that plaintiff had actually been assigned this task one month earlier, and that he had not been able to address it due to unexpected problems with HDC's servers. (Compl. at ¶ 84).

[19] Plaintiff apparently saw no contradiction between his insistence that he would not take assignments from Patibandla and his desire to assign tasks to Patibandla.

minutes later, saying, "[a]ppreciate the effort but please do not update any tars online or make any system changes or monitor grumpy [one of HDC's Oracle servers] at this point in time. [Patibandla] is working on it along with [Choi] so we can not have others in the sy[s]tem without letting us know. This will make matters worse. Please confirm receipt of this email by responding back." (Id. at D000166). According to Mariconda, plaintiff's email reflects the fact that plaintiff had "performed work I specifically had asked him not to perform and failed to communicate with others in the group regarding his intentions." (Mariconda Decl. at ¶ 11). Plaintiff's response does not contain any acknowledgment that he may have caused a problem; it reads, "I just reviewed logs and researched articles from metalink and others only." (Mariconda Decl. at Ex. 5, D000166). This response drew a reprimand from Mariconda:

"Please stay out [of] the logs. By connecting remotely you may be tying up another person from connecting remotely to the server . . . .
[W]e must understand that we must communicate when we plan on even logging into a server remotely for [two] minutes.
I can't stress this enough. Talk, email, call -- all means of communication are readily available. Just please use them and use them correctly.
It avoids redundant works, efforts, miscommunication, stress and headaches."

(Id.). After receiving this email, plaintiff responded, "I

29

logged off remotely. Good night!" (Mariconda Decl. at Ex. 7,
D000150). Mariconda responded with another admonishment to
communicate: "All that I ask for is communication -- not
hidden work or investigative work when we are not together.
Team environm[e]nt -- not a silo or individual. Please learn
to underst[a]nd this." (Id.).


The morning after this last exchange, Mariconda scheduled a
meeting with plaintiff, Choi, and Kulkarni. (See Pl.'s Rule 56.1
Statement at ¶¶ 132-33). Defendants assert that the meeting was
about plaintiff's failure to communicate effectively the previous
night, and that plaintiff's statements about the meeting show that
he continued to misunderstand what was being asked of him. (Defs.'
Reply to Pl.'s Rule 56.1 Statement at pp. 47-48 (citing Mariconda
Decl. at ¶¶ 9-13, Exs. 3-6)). Plaintiff appears to acknowledge in
his affidavit that the meeting was at least in part about his
actions on the previous night, since he asserts that he had not
caused any problems with HDC's Oracle servers, and that Mariconda's
belief that he had was attributable to the fact that Mariconda
"misunderstood the capacity of HDC['s] network technically." (Pl.'s
Aff. at ¶ 419). Nevertheless, plaintiff also states that the
meeting was in regards to his emailed work proposal, and claims
that Mariconda was angry because the proposal revealed Patibandla

30

to be incapable of performing his job. (See Pl.'s Rule 56.1
Statement at ¶ 132; Pl.'s Aff. at ¶¶ 411-14, 418). He asserts that
Mariconda threatened to fire him for revealing Patibandla's
inadequacies. (Pl. Dep. at 180:6-183:25; Pl.'s Aff. at ¶ 414). He
also states in a conclusory manner that he "calmly, professionally,
effectively dealt with Mariconda's unprofessional, threatening, and
discriminatory activities through the meeting, in addition to his
emails [the] prior night." (Pl.'s Rule 56.1 Statement at ¶ 133).
Ultimately, these assertions fit into plaintiff's larger narrative:
that Patibandla was incompetent, that he was hired solely because
of his age and national origin, that Mariconda regularly covered
for him and that, in doing so, he discriminated against plaintiff.

Patibandla ultimately resigned in lieu of being terminated
from HDC on May 22, 2006 (McConnell Reply Decl. at ¶ 13). Mariconda
recommended that HDC terminate Patibandla's employment after
Patibandla had engaged in a shouting match with other members of
the IT Department. (Id. at ¶ 12, Ex. 9 (email from Mariconda to
Mary McConnell and Madhavi Kulkarni (May 18, 2006)). According to
Mariconda's email summarizing the events, Patibandla "was hollering
and acting totally out of control to the point where . . . [other
members of the IT Department] left the room because they did not
feel safe." (Id.). It appears that Patibandla's outburst was

31

precipitated by a severe technical problem -- a crash of HDC's entire production system after it was migrated to a new server -- that he was incapable of remedying quickly. (Id.; see also Pl.'s Aff. at ¶¶ 622-34, Pl.'s Ex. A at ID000140). Regardless of the circumstances, however, Mariconda regarded this altercation as evidence that Patibandla had not improved his communication and leadership skills, as he had been asked to do in his 2006 Appraisal. (McConnell Reply Decl. at Ex. 9; see also id. at Ex. 8, D001442). Therefore, he recommended "that [Patibandla] be asked to leave [HDC] either immediately or the next time he acts in this nature." (McConnell Reply Decl. at Ex. 9).

After Patibandla resigned, he was replaced as HDC's Oracle Apps/DBA[20] by Shiv Kar, whom HDC had hired as an Oracle Developer -- and a permanent, full-time employee -- on February 14, 2006. (Defs.' Rule 56.1 Statement at ¶¶ 19-20). Kar's initial annual salary was $90,000. (Id. at ¶ 19; see also McConnell Reply Decl. at Ex. 8). His salary remained the same upon his promotion to Apps/DBA. (Defs.' Rule 56.1 Statement at ¶ 20; see also McConnell Reply Decl. at Ex. 9). Kar's promotion was effective July 1, 2006 (Defs.' Rule 56.1 Statement at ¶ 20), but Mariconda announced it by

---

[20] It is not clear from the record when (or if) Patibandla's title officially changed from Oracle DBA to Oracle Apps/DBA.

32

email to the IT Team on May 24, 2006. (Pl.'s Ex. K at D000321). The

email reads as follows:

> With [Patibandla] leaving, Shiv [Kar] will pick up his
> workload on the Oracle Apps side of things. [Kar] will
> split his time doing this and development work. [Kar] has
> extensive experience with Oracle Apps so he is very
> familiar with all of this.
> As far as the systems are concerned, [plaintiff] and
> [Kar] will share the duties on the Oracle Applications
> side along with the maintenance of the Timesheet, XRT and
> Imaging applications.
> Please lend your support towards [Kar] in speeding up his
> learning curve on the varying systems.

(Id.).


Kar is of Indian national origin, and was thirty-five years

old when he was hired by HDC. (Pl.'s Rule 56.1 Statement at ¶ 24).

According to Kar's resume, at the time he had "[e]ight years

experience in Oracle ERP implementation, Database/Apps

Administration, and Business Intelligence/OLAP development."

(Mariconda Decl. at Ex. 10). He had also obtained certifications

from the Oracle Corporation in "Client Server Application

Develop[ment]," "Oracle Financials Technical Foundation[s]," and

"Database Backup Recovery/Perf[ormance] Tuning." (Id.). Kar also

has a Master's degree from the University of Nebraska in Management

Information Systems. (Defs.' Reply to Pl.'s Rule 56.1 Statement at

p. 11; see also Mariconda Decl. at Ex. 10, McConnell Reply Decl. at

Ex. 4, p. D0001544).

33

From 2002 until he was hired by HDC, Kar had worked as an Oracle Apps/DBA and Architect for Multinational Utilities Co.; prior to that, he had worked as an Oracle Financials and OLAP Architect for the Gallup Corporation and an Oracle Apps/DBA for Rapidigm. (Id.). In the process of hiring Kar, HDC contacted both Rapidigm and Gallup to obtain references for him. (See McConnell Reply Decl. at Ex. 5). Both companies gave him glowing reviews, including statements such as "[he was a good problem solver and worked well w[ith] the users," and "Shiv was very dedicated . . . [and] easy to work with." (Id.). Kar's 2006 Appraisal from HDC is similarly positive. In it, Mariconda states the following:

> "[Kar] did an outstanding job . . . [t]he systems which he manages, Oracle, XRT, Imaging, Timesheet Database and varying test environments have never been more stable. He has a tremendous knowledge of technology and where he lacks information he takes the time out to learn it and evetually apply it to an issue or opportunity."

(McConnell Reply Decl. at Ex. 6, D001510). This appraisal was signed on March 8, 2007, three months before this lawsuit was filed. (McConnell Reply Decl. at Ex. 6, D001513). More pertinently, Mariconda's email announcing Kar's promotion stated that "[Kar] has extensive experience with Oracle Apps[.]" (Pl.'s Ex. K at D000321).

Unsurprisingly, Yu's submissions paint a different picture. In short, he alleges that Kar was completely unqualified for

34

Patibandla's position -- in fact, much as he did with Patibandla, he states that Kar "had little knowledge about Apps/DBA when he worked for HDC. Kar had little knowledge about Apps system. Kar is disqualified [sic] for Apps/DBA. The only qualifications for Kar to be an Apps/DBA of HDC's employee [sic] were his age, of [sic] his Indian national origin." (Pl.'s Rule 56.1 Statement at ¶ 26).

Putting such conclusory allegations aside, Yu makes several statements that, if taken at face value, again give the impression of an unqualified employee, and one who repeatedly forced Yu and other members of the IT Team to fix his mistakes. Some of these allegations are clearly contradicted by Kar's resume; for example, Yu alleges that Kar "had never worked as an Apps/DBA before" (Pl.'s Rule 56.1 Statement at ¶ 21), but Kar's resume shows several years of experience as an Apps/DBA prior to his employment at HDC. (Mariconda Decl. at Ex. 10).

Many of Yu's other allegations fail upon closer scrutiny. For example, Yu alleges that Kar was so incompetent working with Oracle that his initial assignment was to "find some training classes" so that he might learn how to use Oracle Apps. (Pl.'s Rule 56.1 Statement at ¶ 29; Pl.'s Ex. A at ID000040). The email in which Mariconda assigned Kar to "find some training classes" also

35

contained four other assignments for Kar: "SQL Tuning - AM SQL & Amortization SQL"; "Finish configuring Edison [one of HDC's Oracle servers]"; "RMAN on Davinci [another Oracle server]"; and "Plan technology stack upgrade for Oracle Apps." At least one of these projects appears to require knowledge of Oracle Apps, and two others involved work with HDC's Oracle servers, making them unlikely assignments for someone whose technical knowledge was nonexistant.

Another example is Yu's allegation that "Kar was 'stumbled' on Apps/DBA's README from Oracle Corporation. Kar needed a condensed, highlighted instruction in plain English made by Storozuk [an Oracle consultant] to follow up and do his basic and simple Apps/DBA's job." (Pl.'s Rule 56.1 Statement at ¶ 22 (citing, <u>inter alia</u>, Pl.'s Aff. at ¶¶ 602-06). The cited paragraphs of plaintiff's affidavit suggest that the problem arose when "Mariconda assigned Kar to have one of [the] test/dev Oracle databases patched." Plaintiff states that his suggestion to Kar was to follow the instructions in Oracle's "README" file, and he cites to an email string for this proposition. (<u>See</u> Pl.'s Aff. at ¶¶ 602-03 (citing Pl.'s Ex. K, at D000724)). He then asserts that "Kar 'stumbled' on the task . . . [and] requested a second "thoughts" from Storozuk . . . [who] gave Kar a condensed README with highlighted to follow up

36

in [sic] later than afternoon via an email." (Pl.'s Aff. at ¶¶ 604-
06 (citing Pl.'s Ex. K, at D000724)).

     Once again, the cited email string tells a different story. It
includes an email from Kar, sent to plaintiff, Mariconda, Kulkarni,
the Oracle Help Desk, and two other members of the IT Team who were
apparently working on the project in question. (See Pl.'s Ex. K, at
D000724). This email was sent just after 3:30 p.m. on June 15,
2006, and reads as follows:

>     I just stumbled on an issue - we may have to run the
>     catalog scripts after the database upgrade.
>     I was on the process [sic] of creating an USER in OEM in
>     XRTDEV, [and] got an error. The error went away after I
>     ran the catalog scripts on Bernini/XRTDEV. It may be an
>     issue also on the other instances.
>     [Plaintiff] thought it won't be an issue because it
>     wasn't mentioned in the Patch Decumentation [sic]. Let's
>     run it by Bill Storuzuk.

(Id.). In context, Kar's use of the phrase "stumbled on" is clearly
the vernacular meant to signify that he unexpectedly found
something that he was not originally looking for. Cf. Rosen v.
Dick, 639 F.2d 82, 101 (2d Cir. 1980) ("We will neither inquire
about nor pass judgment on whether Andersen . . . never considered
the jury issues and serendipitously stumbled upon the demand . . .
.). It is unclear whether plaintiff deliberately misrepresented the
exchange or simply did not understand the vernacular, but either
way, it is clear that this email provides no support for

37

plaintiff's assertions that Kar was incompetent.

It also appears from the context of this email that Kar was able to correct the error, but nevertheless informed other members of the IT Team of what had happened and sought suggestions on the issue from both plaintiff and an on-site member of Oracle's technical support staff (Storozuk). This seems to be a prudent course of action, and certainly does not reflect the incompetence that plaintiff suggests. Moreover, contrary to plaintiff's suggestions that Kar was incapable of resolving a serious issue without help from plaintiff and Storozuk, Kar's email reflects the fact that <u>plaintiff</u> thought there was not a problem at all, "because [the issue] wasn't mentioned in the Patch D[o]cumentation." (<u>Id.</u>). Mariconda, however, apparently agreed with Kar's evaluation of the potential issue. The email string cited by plaintiff includes Mariconda's later email to Storozuk, which states that Kar "[p]atched up a database to 9.2.0.7 and came across the issue below." It then asks for Storozuk's thoughts on the matter. This apparently reflects another misunderstanding on plaintiff's part -- plaintiff cites the email string for the proposition that <u>Kar</u> asked for second thoughts from Storozuk (Pl.'s Aff. at ¶ 605), but it was <u>Mariconda</u> who did so, albeit at Kar's suggestion. (<u>See</u> Pl.'s Ex. K, at D000724). Furthermore, the email

38

does not show whether Storozuk ever "gave Kar a condensed README
with highlighted [sic]," as plaintiff asserts in his affidavit.
(Pl.'s Aff. at ¶ 606). Indeed, Storozuk's response is not contained
in plaintiff's submitted exhibits. Regardless, it is apparent that
this particular assertion of Kar's incompetence is without merit.

Nevertheless, plaintiff quite clearly believed that Kar was
unqualified for his position. In fact, plaintiff testified at his
deposition that he believed Mariconda's decision to promote Kar was
motivated by plaintiff's age and national origin, and in
retaliation for plaintiff's complaint to human resources.[21] (Pl.
Dep. at 295:20-296:8; 301:12-24). After plaintiff was informed that
Kar would be promoted to Patibandla's former position, plaintiff
met with Mariconda to speak with him about that decision. (Pl. Dep.
at 303:6-17). This meeting took place on the morning of May 24th,
2006 -- before Mariconda had officially announced Kar's promotion,
but after plaintiff overheard Mariconda discussing the decision
with Kar and Storozuk. (Pl. Dep. at 302:4-303:14). It appears from

------

[21] Plaintiff first learned that Mariconda had decided to
promote Kar on May 23, and discussed that decision with Mariconda
on May 24. (Pl. Dep. at 302:19-303:8). He did not discuss Kar's
promotion with human resources until May 25th. (Pl.'s Rule 56.1
Statement at ¶ 151; Pl. Dep. at 252:15-253:8, 253:19-254:15,
303:23-304:2). It is difficult to see how Mariconda could have
retaliated against plaintiff for an event that had not yet
occurred.

39

plaintiff's deposition testimony that he did not express his belief
that he had been discriminated against at the time, but only stated
that he was willing to fill the Apps/DBA vacancy (Pl. Dep. at
253:12-254:9) and that he believed that Kar was not qualified for
the position. (Pl. Dep. at 303:6-17). He also asked Mariconda why
Kar had been promoted, and Mariconda responded that "he just made
a decision" (Pl. Dep. at 196:2-15[22]), but agreed to consider
plaintiff's application to become an employee of HDC. (Pl. Dep. at
253:19-24).[23]

After the meeting, Mariconda announced Kar's promotion via
email. (Pl. Dep. at 303:17-22). In his declaration to the court, he
explained his decision as having been based on his belief that the
permanent Apps/DBA position "required superior decision-making,
problem-solving, communication, and interpersonal skills," which
plaintiff lacked. (Mariconda Decl. at ¶ 8). He supported his
evaluation of plaintiff's skills by reference to several emails
showing plaintiff's difficulties in communicating with other

---

[22] Silverberg Decl. at Ex. D.

[23] Plaintiff's testimony about this meeting overlaps to a
large extent with his testimony about another meeting with
Mariconda, which took place on May 31st, at which he brought up
his belief that Mariconda had discriminated against him. (Pl.
Dep. at 294:4-21, 304:6-20).

members of the staff (<u>id.</u> at ¶¶ 9-10, 12), his failure to follow
instructions as to work assignments (<u>id.</u> at ¶ 11), his "aversion
towards cooperation and collaboration" and "refus[al] to share
information, make suggestions or recommendations, or assist others"
(<u>id.</u> at ¶ 13), and his general "lack of professionalism and
diplomacy towards[] and . . . inability to work harmoniously with
the members of the IT Department." (<u>Id.</u> at ¶ 13). Mariconda also
stated that, after plaintiff learned that he would not be given the
permanent Apps/DBA position, plaintiff's "hostility and aggression
escalated," he became "increasingly belligerent towards myself,
Kar, and Madhavi Kulkarni" (<u>id.</u> at ¶ 15), and his "behavior became
so  intolerable  that  it  began  to  interfere  with  both  the
productivity and the morale of the IT Department." (<u>Id.</u> at ¶ 16).


    Immediately after Mariconda had announced Kar's promotion to
the IT Department, plaintiff contacted Mary McConnell, who was a
human resources official at HDC. (Pl. Dep. at 253:2-254:15, 303:23-
304:2). Plaintiff met with McConnell for roughly one hour on May
25th, 2006. (Pl.'s Rule 56.1 Statement at ¶ 151; Pl. Dep. at
252:15-253:8, 253:19-254:15, 303:23-304:2). He states that, at the
time, he "complained . . . about Mariconda's discriminatory
activities against me . . . overlooking me on the vacancy." (Pl.'s
Rule 56.1 Statement at ¶ 152). At his deposition, however, he

                               41

appears to state that he did not raise the issue of discrimination at that meeting, but only told Ms. McConnell that he was willing to become an employee of HDC and was qualified for the Apps/DBA position, and that he believed that Kar did not have the experience necessary for the job. (Pl. Dep. at 253:19-254:15). He also stated that McConnell promised to follow up with him about the matter. (Pl. Dep. at 252:15-21). McConnell denies that plaintiff complained to her that "he had been discriminated against by Mariconda or any other employee or contractor of HDC." (McConnell Decl. at ¶ 12).

The following day -- the Friday before Memorial Day weekend -- plaintiff pointed out via an email sent at 7:43 a.m. that HDC's servers had not had a full system back up in several months. (See Pl.'s Ex. J, at D001362, D001364-65). The issue became apparent because other members of the IT Team had attempted to find missing files during the previous two days, but had been unable to do so efficiently because the files that could be used to find them had not been backed up for several months. (Pl.'s Ex. J, at D001364-65). Mariconda immediately approved the project, responding via an email at 8:36 a.m., which suggested that plaintiff and others "kick[] off a full backup of prod[uction] servers [S]aturday night into [S]unday. If [you] guys do be sure to let the business know what time everything will be unavailable." (Pl.'s Ex. J, at

42

D001364). Mariconda closed his email by saying, "I'm out today so enjoy your weekends." (Id.). Plaintiff responded just after noon, saying that "Ping [Choi] is going to implement the whole server backup tonight . . . ([e]xact time period is pending on Madhavi [Kulkarni]'s schedule with Business users). (Id.). That weekend, Mariconda called plaintiff and asked him to shut down HDC's servers remotely due to an overheating alarm in HDC's server room; plaintiff did so immediately. (Pl.'s Rule 56.1 Statement at ¶ 154; Pl.'s Aff. at ¶¶ 588-590).

On May 30, 2006, the Tuesday after Memorial Day, Mariconda sent plaintiff an email regarding his hours. (Pl.'s Rule 56.1 Statement at ¶ 155; see also Pl.'s Ex. J at D000220). The email stated that plaintiff's contract was "running close to projecting out to our budgeted amount," which Mariconda stated had been "50 weeks of work at 35 hours per week." (Pl.'s Ex. J at D000220). He asked plaintiff to "keep [his] weekly hours to 35," and to "take 5 days off" at some point "[b]etween now and the end of July," but stated that HDC would accommodate emergency requirements. (Id.). He offered plaintiff the option to "either take 5 consecutive days or spread them out over this time period." (Id.).

The following day (Pl. Dep. at 294:15-16), when plaintiff had

43

not yet heard a response from McConnell, he again spoke to
Mariconda about the decision to promote Kar, and informed Mariconda
that the decision was not merely wrong, it was unlawful. (Pl. Dep.
at 294:4-295:7; see also Pl. Dep. at 304:6-20)). At the time, it
seems that Mariconda said that his decision was made, but that he
would still consider plaintiff for future vacancies. (Pl. Dep. at
294:9-14).

Plaintiff also avers that, during the same conversation, he
brought up Mariconda's request that he take time off, and
questioned Mariconda's calculations, suggesting that there was
still enough money remaining in HDC's budgeted amount for him to
work 50-hour weeks through the remainder of the first year of his
contract. (See Pl.'s Aff. at ¶ 722). Plaintiff states that he
suggested that they could renew their discussion of the budget
issue after plaintiff returned from his daughter's college
graduation three weeks later, and that Mariconda agreed. (Id. at ¶
723). After only two weeks, however, Mariconda sent plaintiff
another email regarding his hours, in which he stated that he had
"[n]ever heard back from [plaintiff] on taking some days off," and
asked that plaintiff update him by that Friday, when he had a
budget review and would need to provide exact numbers. (Pl.'s Ex.
J, at D000220). It is unclear from the parties' submissions whether

44

plaintiff ever replied to this email.

On the morning of June 7, 2006, plaintiff emailed Mariconda and several other members of the IT Team to inform them that he was going ahead with a planned maintenance shutdown of one of HDC's servers that day. (Pl.'s Ex. J at D000221). Mariconda responded with an email to plaintiff, Kar, and Kulkarni, which ordered Kar to "please sit with [plaintiff] to get some good exposure to this." (Id.).

That afternoon, plaintiff went to the EEOC, "to get some kind of consultation about how to deal with" his situation at HDC. (Pl. Dep. at 304:21-305:9). It is unclear whether he told the EEOC that he believed he had been discriminated against. At the time, plaintiff had still not received a response from McConnell, and he had not spoken with Mariconda since their May 31 conversation. (Id.). There is no evidence that he informed anyone at HDC that he had gone to the EEOC, although his complaint points out that he "put almost two hours lunch break for the day on his bi-weekly time sheet," which Mariconda signed on June 13, 2006. (Compl. at ¶ 126; see also Pl.'s Ex. N, at D001779 (Pl.'s Time Sheet for May 28-June 11, 2006)).

45

Plaintiff spoke with McConnell again on June 13th (Pl. Dep. at 305:16-20), although it is unclear what he said to her at that time. He alleged in his complaint that he told McConnell that he believed Mariconda's actions were discriminatory, and that she told him that she had passed his earlier assertions to that effect on to Mariconda, who was "irritated" by plaintiff's accusation. (Compl. at ¶ 128). McConnell, on the other hand, stated that plaintiff never expressed his belief that he had been discriminated against, and never informed her that he had gone to the EEOC. (McConnell Decl., at ¶ 12). Plaintiff testified that Mariconda saw him coming out of McConnell's office, but that the two did not speak at the time. (Pl. Dep. at 305:18-306:16; see also Pl.'s Aff. at ¶¶ 758-761). In fact, there is no evidence that plaintiff and Mariconda ever discussed plaintiff's meetings with McConnell. The following day, Mariconda sent plaintiff a second email regarding Mariconda's request that plaintiff take a few days off before the end of July, when the first year of plaintiff's contract was up. (Pl.'s Rule 56.1 Statement at ¶ 165; Pl.'s Ex. J, at D000220, D000849).

The following Monday, plaintiff took a day off from work to go to his daughter's college graduation ceremony in California. (See Pl.'s Rule 56.1 Statement at ¶ 166; Pl.'s Aff. at ¶ 764). When plaintiff returned to work on the morning of June 20, 2006, he sent

46

an email to Mariconda entitled "Patches for Production's
Outstanding Issues, Refresh with Rman, ..." (Pl.'s Ex. J, at
D002435). The email listed several possible patches that could be
performed on "Newton", one of HDC's Oracle servers, in an effort to
resolve "existing production issues." (Id. at D002435-36). At one
point, the email asked Mariconda for Newton's current patch status.
(Id. at D002436). Mariconda responded only three minutes after Yu's
initial email, saying, "I am out today and unavailable[.] Shiv
[Kar] is working on Newton. Get an update from him[.] Coordinate
all with [M]adhavi [Kulkarni] and Bill [Storozuk] if questions
arise. Thanks." (Id. at D002435).[24] Mariconda also forwarded the
email to Kulkarni and Kar. Kar emailed plaintiff six minutes later,
saying, "[h]ere is NEWTON['s] current patch status." (Id.).
Plaintiff "raised [a] question with Kar's conclusion" (Pl.'s Aff.
at ¶ 770) via an email sent just over half an hour later, which
stated that the attachment to Kar's earlier email had been pulled
from "inside of [a] database in Newton . . . [which] was refreshed
after patched production in Feb. 2006. It is not necessary means
[sic] that it is patched as the same patch level as the source
database is." (Pl.'s Ex. J at D002435). Plaintiff asked whether Kar
had "more information [that] could prove whether it is patched at

---

[24] In both his Rule 56.1 Statement and his affidavit,
plaintiff quoted only the first sentence of this email.

what level beyond data from inside of the database?" (Id.). Either Kar never replied to this email, or his reply was not contained within the parties' submissions.

The following day -- June 21, 2006 -- was plaintiff's last day at HDC. That morning, according to plaintiff's affidavit, the first thing he did upon arriving at work was discuss his trip to California and his daughter's graduation ceremony with Mariconda.[25] (Pl.'s Aff. at ¶¶ 772-775; Pl. Dep. at 291:1). At 8:11 A.M., after their meeting concluded, Mariconda emailed plaintiff to troubleshoot a problem flagged by John Crotty, HDC's Executive Vice President and Chief of Staff. (Pl.'s Aff. at ¶ 776; Pl. Dep. at 292:10-18; Pl.'s Ex. J at D000858; see also McConnell Decl. at Ex. 5, D000020 (listing Crotty's title)). Mariconda's email shows that Crotty had emailed a subordinate with approval for a purchase requisition, but that the subordinate had never received the email, and Crotty asked Mariconda to figure out what had happened. (Pl.'s Ex. J at D000858). Plaintiff testified that this assignment was "very important because Mr. Crotty . . . [could] not do his job" and that Mariconda asked him "to solve this problem as soon as

_____

[25] Plaintiff testified at his deposition that, on most days when he worked at HDC, he would stop by Mariconda's office at the beginning of the day to say hello. (Pl. Dep. 144:3-6).

possible, immediately." (Pl. Dep. at 292:12-16). Mariconda's email, on the other hand, asks plaintiff to work on the matter "this morning when you are free." (Pl.'s Ex. J at D000858).

At 8:47 A.M., plaintiff emailed Kar and Kulkarni to ask "[w]hy, when is [N]ewton's Oracle up and down [sic]?"[26] (Pl.'s Ex. J at D002432). Kar responded at 8:57 A.M. that he was patching Newton (id.), and plaintiff responded back, "[y]esterday, I've sent you e-mail and plus talked to you about what level of patched for Newton [sic]. There is no answer for it yet. What patch are you applying to Newton? We should have discussion about patching before apply[ing] any patches to Oracle here, even test, development environments."[27] (Id.). It does not appear that Kar responded to this last email.

Plaintiff continued to work on the problem flagged by Crotty, which he alleges was caused by Kar. (Pl.'s Rule 56.1 Statement at ¶ 169). At some time that morning, plaintiff participated in a

---

[26] Plaintiff does not attempt to explain why he was attempting to access an Oracle server shortly after he was assigned Crotty's project.

[27] Plaintiff also does not attempt to explain why Kar was required to check with plaintiff before patching one of HDC's Oracle servers.

meeting with Kar, Kulkarni, and Mariconda, at which he stated that
he could not (or would not) continue working on any of his tasks
beyond his current troubleshooting until Kar re-verified the level
of patches on Newton, and he informed Kar where he could check that
information. (Pl.'s Aff. at ¶¶ 779-81; see also Pl. Dep. at 292:19-
23). According to plaintiff, Mariconda asked Kar to verify the
patch information as plaintiff had requested (Pl.'s Aff. at ¶ 782),
and plaintiff continued to troubleshoot the problem flagged by
Crotty until approximately noon that day. (Pl.'s Rule 56.1
Statement at 171, Compl. at ¶ 137). At that time, Mariconda called
plaintiff into McConnell's office and told him that his contract
was terminated effective immediately. (Pl.'s Rule 56.1 Statement at
¶¶ 171-72). When plaintiff asked for a reason, Mariconda said only
that plaintiff's contract was terminable at will. (See id., Pl.'s
Aff. at ¶¶ 791-93).


    Plaintiff initially refused to leave HDC until he received a
termination letter. (See Pl.'s Rule 56.1 Statement at ¶¶ 175-76).
McConnell ultimately produced such a letter, signed by Teresa
Gigliello, a Senior Vice President at HDC. (McConnell Reply Decl.,
at Ex. 2). The letter states that plaintiff's Consulting Agreement
was terminated pursuant to Section 2 of the Agreement (id.), which
states that the Agreement shall continue "until terminated by

50

either party at any time for any reason or no reason." (McConnell Decl. at Ex. 5). Plaintiff now alleges that, while waiting for the letter, he informed McConnell that he believed his termination was discriminatory, and was in retaliation for his earlier complaints of discrimination. (Pl.'s Aff. at ¶ 813). McConnell, however, stated that plaintiff "never spoke with me regarding any unlawful retaliatory termination." (McConnell Reply Decl. at ¶ 3).

### D. Other Factual Disputes

#### 1. The Unpaid-Wages Controversy

A handful of other factual allegations are relevant to our disposition of this motion. First, plaintiff initially claimed that he had never received payment for his final days at HDC. (Compl. at ¶ 143). We later deemed his complaint amended to explicitly include a claim for unpaid wages with accrued interest. (Endorsed Order dated May 7, 2010). At his deposition, plaintiff testified that he had never turned in a timesheet for that period, as he no longer had a contact at HDC. (Pl. Dep. at 152:16-24, 155:3-13, 155:24-156:3). He also testified that he refused to return the laptop and Blackberry that HDC had provided to him until he received his last payment. (Pl. Dep. at 140:20-141:3, 155:10-16).

It appears that, in 2008 or 2009, HDC submitted a Form 1099 to the IRS for some additional payment to plaintiff, which may have included his payment for the final weeks he worked. (See Pl.'s Aff. at ¶ 844). Nonetheless, plaintiff claims that he never received this payment. (Id.). He also claims that we "explicitly directed defendants to deal with the IRS" regarding this matter (id.) and that defendants failed to do so. A review of the transcript of our most recent conference with the parties reveals, however, that while plaintiff requested that we "immediately order the counsel immediately [sic] deal with this one, deal with the IRS" (Tr. of Apr. 6, 2010 Conf., at 5), we made no such order. Instead, we asked defendants' counsel if he was aware of the IRS's letter, and upon receiving a negative response, directed him to "see just informally if you can find someone at your client who can at least take a look at this and see what the story is on it." (Id. at 6).

By letter dated May 28, 2010, defendants' counsel informed us that HDC had received plaintiff's final timesheet as part of his initial disclosures, processed it internally, and reported payment to the IRS, but that "apparently a check was never sent to Plaintiff." (Letter from Dean L. Silverberg, Esq., to the Court, May 28, 2010). HDC sent a check to plaintiff for his last timesheet on April 23, 2010, and filed an amended Form 1099 for 2008 with the

52

IRS, noting that no payment was made to plaintiff that year. (Id.).
Plaintiff received this check on April 25, 2010, but noted that it
did not contain interest for the intervening time. (Letter from
Steve Yu to the Court, Apr. 30, 2010).

## 2. Plaintiff's Employment Status

Defendants contend that plaintiff was an independent
contractor, not an employee, and therefore is not protected by
several of the laws under which he now seeks relief. (Defs.' Mem.
of Law at 4-7). In response, plaintiff submits a letter from the
IRS determining that he was an employee for income-tax purposes.
(Pl.'s Ex. M).

## 3. Evidence of Age Discrimination

Plaintiff claims that certain remarks made by a member of
HDC's IT Department reveal an intent to discriminate against him on
the basis of his age. Plaintiff testified at his deposition that
shortly after he began working at HDC, he mentioned to Kulkarni
that he had a daughter in college, and that she was surprised
because he did not look old enough to have a daughter that age.
(Pl. Dep. at 296:23-297:10; see also Pl.'s Aff. at ¶¶ 343-44).

53

After that, according to the plaintiff, "everything seems like changed because I kind of more mature or talk about some things, you know, beyond these kids before teenage or still below teens." (Pl. Dep. at 297:11-16). We take this latter statement by the plaintiff to assert that Kulkarni's attitude towards him changed after she discovered his age. We note, however, that plaintiff points to no specific discriminatory statements or treatment by Kulkarni because of his age. In fact, plaintiff stated in his affidavit that Kulkarni requested his advice on educating her children after finding out that his daughter was attending a top college. (Pl.'s Aff. at ¶ 343).

### 4. Fallout from the Refusal to Hire Plaintiff as an Employee

Plaintiff also alleges that he was treated differently by members of the IT Team after it became clear that he would not be offered Patibandla's position as an employee of HDC. In fact, plaintiff referred to the moment when Kar's promotion was announced as "the turning point" after which "everybody change[d] their attitude to me [sic]." (Pl. Dep. at 255:8-12).[28] When pressed, however, he could recall only one specific incident in which a

---

[28] Silverberg Decl. at Ex. D.

member of the IT Team, Faith Flesser, interrupted a conversation he
was having with Mariconda and "said very rude words." (Pl. Dep. at
258:2-260:11).


As a related matter, plaintiff notes that several other
members of the IT Team (in addition to Kar, Patibandla and
Kulkarni) were younger than he and/or of Indian national origin.
(See Pl.'s Rule 56.1 Statement at ¶ 14). He also alleges that he
was treated differently from a handful of other members of the IT
Team, each of whom was offered a position as an employee of HDC
after some time working for HDC as an independent contractor, and
he seems to suggest that many of the people who left the IT
Department around the time of his tenure there were over forty
years old and thus within the class protected by the ADEA.


Since July 2004, only two independent contractors at HDC have
made the transition to permanent employee status: Michelle Antao
and Mani Sivaparkasam. (Defs.' Rule 56.1 Statement at ¶ 15). No
other new employees were hired by HDC after Patibandla's departure
in May of 2006. (Id. at ¶ 18).


Antao joined HDC in September of 2004. (Defs.' Rule 56.1
Statement at ¶ 16). She initially received thirty dollars per hour,

55

to a maximum of $50,000 annually. (Pl.'s Rule 56.1 Statement at ¶ 16). After one year, her contract with HDC was amended to change her compensation to thirty-five dollars per hour, to a maximum of $63,000 annually. (See id.; see also Pl.'s Ex. F at D000532). In May of 2006, HDC changed her status from independent contractor to employee. (Pl.'s Rule 56.1 Statement at ¶¶ 15-16; Defs.' Rule 56.1 Statement at ¶ 16). At the time, she was twenty-four or twenty-five years old. (Pl.'s Rule 56.1 Statement at ¶ 16; McConnell Decl. at ¶ 17). Antao is of Kenyan national origin. (McConnell Decl. at ¶ 17).

Sivaparkasam joined HDC as a consultant in September of 2005 and became an employee on March 31, 2008. (Defs.' Rule 56.1 Statement at ¶ 17). During her time as a consultant, she was actually employed by Quest America, Inc. (See Pl.'s Ex. F, at D000460, D000500). She is of Indian national origin (Pl.'s Rule 56.1 Statement at ¶ 14) and was thirty-five years old when she became an employee of HDC as an Oracle Apps Developer. (Id. at ¶ 17).

Plaintiff also notes that there were four additional Oracle Apps Developers in HDC's IT Department, named Matthew Varghese, Kadirvelu Palanippan, Vijay Pandu, and Deepa Goel, all of whom were

of Indian national origin. (Pl.'s Rule 56.1 Statement at ¶¶ 14, 18
Pl.'s Aff. at ¶¶ 127-36). Varghese became an employee of HDC on
October 4, 2004, and resigned on December 27, 2005 (effective
January 6, 2006), at the age of forty-four. (Pl.'s Aff. at ¶¶ 128-
29). Palanippan joined HDC as an Apps Developer on January 24,
2005, and left on August 16, 2005, at the age of forty-four. (Pl.'s
Aff. at ¶¶ 130-32). Pandu, like Sivaparkasam, was employed by Quest
America, Inc., and worked at HDC as a consultant beginning in
December of 2005. (See Pl.'s Ex. F at D000442; see also Pl.'s Aff.
at ¶ 135). Deepa Goel was hired on June 27, 2006, when he was
twenty-five years old (Pl.'s Rule 56.1 Statement at ¶ 18), and
began work as an Apps Developer on July 31, 2006. (Defs.' Reply to
Pl.'s Rule 56.1 Statement at p. 8; see also Pl.'s Ex. F at D000524,
D000526, McConnell Reply Decl. at ¶ 5, Ex. 3). Goel's contract was
initially set to end on July 31, 2007, (Pl.'s Ex. F at D000526,
McConnell Reply Decl. at Ex. 3), but was extended at least twice,
with a new contract beginning on November 12, 2007 under which Goel
was "employed and paid through Finsoft Incorporated." (Pl.'s Ex. F
at D000523). Although the Contract Approval Form for Goel's work
refers to an "Oracle Consulting Project" (Pl.'s Ex. F at D000524),
defendants point out that Goel's contract involved mainly gathering
statistical information about HDC's activities and communicating
this information to outside agencies, not any programming or

57

database management. (Defs.' Reply to Pl.'s Rule 56.1 Statement, at p.8; <u>see</u> <u>also</u> McConnell Reply Decl. at Ex. 3).


Plaintiff's affidavit mentions one other contractor in the IT Department, Ms. Irene Yau. (Pl.'s Aff. at ¶¶ 241-45). Ms. Yau was originally employed by HDC in 1977, at the age of twenty-eight. (<u>Id.</u> at ¶ 241). She left HDC in 2006, at the age of fifty-six. (<u>Id.</u>). Neither plaintiff nor defendants identify Ms. Yau's national origin. In her final year at HDC, Ms. Yau worked part-time as a computer programmer, pursuant to a consulting agreement that ran from May 11, 2005 to May 11, 2006. (<u>Id.</u> at 242; <u>see</u> <u>also</u> Pl.'s Ex. F at D000355). On May 1, 2006, Mariconda emailed the IT Team with a list of tasks for the week, which included notice that "Irene [Yau] will be working with HDC one day per week until the end of May and then she'll end her contract with HDC." (Pl.'s Ex. D at D000717).[29] The email asked the remainder of the IT Team to "summarize any projects that you are working on with her to ensure a smooth transition." (<u>Id.</u>).

---

[29] Plaintiff states in his affidavit that Ms. Yau left HDC "at [the] age of 55 years old, on February 1, 2005." (Pl.'s Aff. at ¶ 241). Since both Ms. Yau's contract and Mariconda's May 1, 2006 email contradict this assertion, we do not credit it. In any event, the discrepancy is immaterial.

Analysis

We first summarize the legal standards under which we analyze defendants' motion, and then move on to our analysis of the motion itself.

A. Summary Judgment Standards

We may enter summary judgment only if, after considering the pleadings and the supporting affidavits provided by the parties, we find, based on the undisputed facts, that there are "no genuine issues as to any material fact and [that the moving party] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Shade v. Hous. Auth. of the City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)); see also Williams v. Utica Coll. of Syracuse Univ., 453 F.3d 112, 116 (2d Cir. 2006). It is axiomatic that the

responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986); see, e.g., Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009); Anderson, 477 U.S. at 255; Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see, e.g., Celotex, 477 U.S. at 322; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the movant fails to meet its initial burden, the motion will fail even if the

60

opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. <u>See</u>, <u>e.g.</u>, <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 161 (1970); <u>Giannullo v. City of New York</u>, 322 F.3d 139, 140-41 (2d Cir. 2003).

If the moving party meets its initial burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a <u>genuine issue for trial</u>.'" <u>Caldarola v. Calabrese</u>, 298 F.3d 156, 160 (2d Cir. 2002) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (emphasis in original)). When evaluating whether a genuine dispute of material fact exists, we are bound to view the evidence submitted by the parties in the light most favorable to the party opposing the summary-judgment motion. <u>Id.</u> This is particularly true where the party opposing summary judgment is <u>pro se</u>, in which case we "must read that party's papers liberally and interpret them 'to raise the strongest arguments that they suggest.'" <u>Wali v. One Source Co.</u>, 678 F.Supp.2d 170, 177 (S.D.N.Y. 2009) (quoting <u>McPherson v. Coombe</u>, 174 F.3d 276, 280 (2d Cir. 1999)). However, even a <u>pro se</u> party cannot satisfy his burden by reference to the pleadings. <u>See</u>, <u>e.g.</u>, <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000); <u>Wali</u>,

61

678 F.Supp.2d at 177 (citing <u>Champion v. Artuz</u>, 76 F.3d 483, 485 (2d Cir. 1996)). Similarly, "[c]onclusory allegations [or denials], conjecture, and speculation . . . are insufficient to create a genuine issue of fact." <u>Kerzer v. Kingly Mfg.</u>, 156 F.3d 396, 400 (2d Cir. 1998) (internal quotations omitted). In short, the non-moving party "must offer some hard evidence showing that its version of the events is not wholly fanciful," <u>Golden Pac. Bancorp. v. F.D.I.C.</u>, 375 F.3d 196, 200 (2d Cir. 2004) (quoting <u>D'Amico v. City of New York</u>, 132 F.3d 145, 149 (2d Cir. 1998)), and "we are obliged 'carefully [to] distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.'" <u>Woodman v. WWOR-TV, Inc.</u>, 411 F.3d 69, 75 (2d Cir. 2005) (quoting <u>Bickerstaff v. Vassar Coll.</u>, 196 F.3d 435, 448 (2d Cir. 1999)). The "mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat summary judgment. <u>Anderson</u>, 477 U.S. at 252.

We apply these standards first to plaintiff's ERISA claim, then to his discrimination claims, and finally to his claim for unpaid wages.

B. <u>HDC's Benefit Plans are not Subject to ERISA</u>

Plaintiff claims that he was not paid benefits during his employment at HDC, and that HDC is therefore in violation of ERISA.[30] (Compl. at ¶¶ 194-95). HDC in turn responds that its employee-benefit plans are "governmental plans" and therefore that ERISA does not apply. (Defs.' Mem. of Law at 37). HDC is correct, and hence we recommend that defendants's motion be granted as to plaintiff's ERISA claim.

ERISA does not apply to any employee benefit plan that is a "governmental plan", 29 U.S.C. §1003(b), which is defined as "a plan established . . . for its employees . . . by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." 29 U.S.C. § 1002(32); <u>see also</u> <u>Rose v. Long Island Railroad</u>, 828 F.2d 910, 914 (2d Cir. 1987); <u>Vandermark v. City of New York</u>, 615 F.Supp.2d 196, 210 (S.D.N.Y. 2009). In <u>Rose</u>, the Second Circuit considered whether a pension plan established by the Long Island Railroad ("LIRR") was a "governmental plan" and thus exempt from ERISA. <u>See generally</u> 828 F.2d at 913-21. It first considered whether the MTA could properly

---

[30] Yu's complaint does not allege any ERISA violation by Mariconda.

be considered a "political subdivision" of the State of New York,
id. at 915-17, then examined whether the LIRR, a public benefit
corporation that is a subsidiary of the MTA, id. at 917, was an
"agency or instrumentality" of the MTA, id. at 917-19. In the
latter inquiry, the Court of Appeals relied on an IRS
interpretation of the same language from the portion of the
Internal Revenue Code addressing ERISA. Id. at 917-18. That
interpretation "lists six factors to be considered in determining
whether a particular entity is an agency or instrumentality:

> . . . (1) whether it is used for a governmental purpose
> and performs a governmental function; (2) whether
> performance of its function is on behalf of one or more
> states or political subdivisions; (3) whether there are
> any private interests involved, or whether the states or
> political subdivisions involved have the powers and
> interests of an owner; (4) whether control and
> supervision of the organization is vested in a public
> authority or authorities; (5) if express or implied
> statutory or other authority is necessary for the
> creation and/or use of such an instrumentality, and
> whether such authority exists; and (6) the degree of
> financial autonomy and the source of its operating
> expenses.

Rose, 828 F.2d at 918 (quoting Rev. Rul. 57-128, 1957-1 C.B. 311).
As did the LIRR in Rose, HDC satisfies all six of these criteria.
HDC was created to address two problems: the "seriously inadequate
supply of safe and sanitary dwelling accommodations within the
financial reach of families and persons of low income," and the
"large number of multiple dwellings which are inadequate, unsafe or

64

insanitary and which can be made adequate, safe and sanitary by rehabilitation or other improvement." N.Y. Priv. Hous. Fin. Law §§ 651(1)-(2). The state legislature found that neither of these problems could be remedied by "the ordinary operations of private enterprise without public aid." Id. at § 651(2). It therefore created HDC, a public benefit corporation,[31] in 1971 under Article XII of the New York Private Housing Finance Law. See N.Y. Priv. Hous. Fin. Law § 653; see also Compl. at ¶ 11. HDC performs a governmental function, "increas[ing] the supply of multi-family housing by providing financing for the construction and preservation of affordable housing through low interest mortgage loans within the Port of New York district." (Compl. at ¶ 11). Moreover, HDC was created to perform this function on behalf of the New York City government, a political subdivision of the State. It therefore satisfies the first and second Rose factors.

HDC is controlled by a seven-member board consisting of three New York City officials, two members appointed by the mayor of New York City, and two members appointed by the governor of New York State. N.Y. Priv. Hous. Fin. Law § 654. This gives both the City

---

[31] The LIRR is also a public benefit corporation, having been converted from a stock corporation in 1980. Rose, 828 F.2d at 917.

and the State the power of an owner, satisfying the third <u>Rose</u>
factor, and vests control in the public authorities, satisfying the
fourth <u>Rose</u> factor. HDC was created by express statutory authority,
<u>id.</u>, satisfying the fifth <u>Rose</u> factor. Finally, as to the sixth
factor, HDC largely finances itself through mortgage activity and
the sale of bonds, but also receives funding from New York City.
<u>See</u> HDC, 2009 Annual Report, at p. 37 (listing $161,345 as "Project
contributions and funds received from NYC" in 2009), <u>available</u> <u>at</u>
http://www.nychdc.com/pdf/AnnualReports/Annual%20Report%202009.pdf.
Plaintiff does not dispute any of these facts. In fact, the section
of plaintiff's opposition dealing with ERISA consists almost
entirely of block quotes from inapplicable cases, and does not
address the applicability of ERISA to HDC. (<u>See</u> <u>generally</u> Pl.'s
Opp'n at 20-22). Hence we have no doubt that HDC is an "agency or
instrumentality" of the State of New York and New York City, and
that its benefit plans are "governmental plans" exempt from ERISA.
We therefore recommend that defendants' motion for summary judgment
be granted on plaintiff's ERISA claim.

66

C. Yu's Discrimination Claims

1. Yu's Claims Against Mariconda

As a preliminary matter, we address plaintiff's attempt to assert claims against Mariconda individually. Yu's complaint appears to assert claims under Title VII, the ADEA, and the NYSHRL against Mariconda in his capacity as an official of HDC. Since "[a] suit against a person in his or her official capacity is 'only another way of pleading an action against an entity of which an officer is an agent,'" Xu v. City of New York, 2010 WL 3060815, at *2 n.4 (S.D.N.Y. Aug. 3, 2010) (quoting Hafer v. Melo, 502 U.S. 21, 25 (1991)), these claims are effectively claims against HDC and are thus redundant. Emmons v. City University of New York, 715 F.Supp.2d 394, 410-411 (citing cases); see also Miller v. City of Ithaca, 2010 WL 3809842, at *9 (N.D.N.Y. Sept. 22, 2010) ("Claims against individual defendants in their official capacities are really claims against the municipality and, thus, are redundant when the municipality is also named as a defendant.") (quoting Zachary v. Clinton County, N.Y., 2003 WL 24197685, at *2 (N.D.N.Y. Jan. 10, 2003)). We therefore recommend that the court grant defendant Mariconda summary judgment on these claims insofar as they are pleaded against him in his official capacity.

67

Plaintiff also appears to assert claims under Title VII, the ADEA, and the NYSHRL against Mariconda in his individual capacity.[32] (See Compl. at ¶¶ 146, 155, 159). "[I]ndividuals are not subject to liability under Title VII." Patterson v. County of Oneida, N.Y., 375 F.3d 206, 221 (2d Cir. 2004) (quoting Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000)). The same is true of the ADEA. Fox v. State University of New York, 497 F.Supp.2d 446, 449 (E.D.N.Y. 2007) (citing, inter alia, Ocasio v. Riverbay Corp., 2007 WL 1771770, at *7 (S.D.N.Y. June 19, 2007)); Parker v. Metro. Transp. Auth., 97 F.Supp.2d 437, 452 (S.D.N.Y. 2000) (citing cases). We therefore recommend that defendants' motion for summary judgment be granted as to plaintiff's Title VII and ADEA claims against Mariconda.

On the other hand, "[u]nder the NYSHRL and NYCHRL an individual may be held liable as an aider and abettor of discriminatory practices once liability is established against the employer." Turowski v. Triarc Companies, Inc., ___ F.Supp.2d ___, 2011 WL 102732 (S.D.N.Y. Jan. 5, 2011) (citing Sowemimo v. D.A.O.R.

---

[32] Yu does not assert claims against Mariconda under the NYCHRL or 42 U.S.C. §§ 1981, 1983, and 1985. To the extent that we may read his complaint liberally to encompass such claims, see Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994), we do so only insofar as they allege claims of discrimination that are already encompassed within Title VII, the ADEA, and the NYSHRL.

Sec., Inc., 43 F.Supp.2d 477, 490-91 (S.D.N.Y. 1999)). Furthermore, "an individual can be liable [under the NYSHRL] . . . if he 'actually participates in the conduct giving rise to a discrimination claim.'" Stevens v. New York, 691 F.Supp.2d 392 (S.D.N.Y. 2009) (citing Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995), abrogated on other grounds, Burlington Ind., Inc. v. Ellerth, 524 U.S. 742 (1998)). We will therefore return to Yu's NYSHRL claim against Mariconda after discussing his discrimination claims against HDC.


2. Yu's Employment Status


Defendants initially seek summary judgment on all of Yu's claims on the basis that he was an independent contractor, not an employee, and hence is not protected by the antidiscrimination laws. (Defs.' Mem. of Law at 4). "Title VII, by its terms, applies only to 'employees.'" Salamon v. Our Lady of Victory Hosp., 514 F.3d 217, 226 (2d Cir. 2008) (citing 42 U.S.C. § 2000e(f)). The same is true of the ADEA, see Legeno v. Douglas Elliman, LLC, 311 Fed. Appx. 403, 404 (2d Cir. 2009) (citing Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 509 (2d Cir. 1994)), and the NYSHRL. See Salamon, 514 F.3d at 226 (citing Scott v. Massachusetts Mut. Life Ins. Co., 86 N.Y.2d 429, 433-34, 633 N.Y.S.2d 754, 755-56

(1995)).[33] We must therefore first examine whether Yu was an
employee of HDC to determine whether summary judgment on his claims
under these statutes would be appropriate on this basis.

The NYCHRL, however, protects independent contractors from
discrimination so long as they are "'natural persons' who 'carry
out work in furtherance of an employer's business enterprise.'"
Fowler v. Scores Holding Co., Inc., 677 F.Supp.2d 673, 680
(S.D.N.Y. 2009) (quoting NYCHRL § 8-102(5)); Banks v. Corr. Servs.
Corp., 475 F.Supp.2d 189, 198 (E.D.N.Y. 2007) (citing cases).
Moreover, insofar as plaintiff's complaint may be read to encompass
claims under sections 1981, 1983, and 1985, these sections do not
refer to "employees", but to "person[s]" or "citizen[s]", and
therefore Yu's employment status is not relevant to his claims
under those statutes.

a. Governing Law

In addressing whether antidiscrimination plaintiffs are

---

[33] ERISA likewise does not apply to independent contractors.
See Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 320-21
(1992). Since, however, we have already determined that HDC's
benefit plans are not subject to ERISA, we need not address
whether Yu's employment status provides us an additional reason
to recommend summary judgment on his ERISA claims.

employees or independent contractors, we look to the common law of
agency. <u>Salamon</u>, 514 F.3d at 226-27 (citing cases) (applying
common-law agency test to Title VII claims); <u>Legeno</u>, 311 Fed. Appx.
at 404 (same for ADEA claims); <u>Fowler</u>, 677 F.Supp.2d at 679 (same
for NYSHRL claims). The common-law agency test "depends on a fact
specific analysis of thirteen factors articulated by the Supreme
Court in <u>Community for Creative Non-Violence v. Reid</u>, 490 U.S. 730
. . . (1989)." <u>Salamon</u>, 514 F.3d at 226. The "<u>Reid</u> factors" are as
follows:

> [1] the hiring party's right to control the manner and
> means by which the product is accomplished[;] . . . . [2]
> the skill required; [3] the source of the
> instrumentalities and tools; [4] the location of the
> work; [5] the duration of the relationship between the
> parties; [6] whether the hiring party has the right to
> assign additional projects to the hired party; [7] the
> extent of the hired party's discretion over when and how
> long to work; [8] the method of payment; [9] the hired
> party's role in hiring and paying assistants; [10]
> whether the work is part of the regular business of the
> hiring party; [11] whether the hiring party is in
> business; [12] the provision of employee benefits; [13]
> and the tax treatment of the hired party.

<u>Id.</u> (quoting <u>Reid</u>, 490 U.S. at 751-52). We may consider other
factors, so long as they are relevant and drawn from the common law
of agency. <u>Id.</u> (quoting <u>Eisenberg v. Advance Relocation & Storage,</u>
<u>Inc.</u>, 237 F.3d 111, 114 n.1 (2d Cir. 2000)). "As to the listed
factors, the court must weigh only those 'that are actually
indicative of agency in the particular circumstances,' []

71

disregarding those that are either irrelevant or of indeterminate weight." Id. (quoting Langman Fabrics v. Graff Californiawear, Inc., 160 F.3d 106, 111 (2d Cir. 1998)) (internal citation omitted). "In the context of anti-discrimination cases, courts should 'place special weight on the extent to which the hiring party controls the 'manner and means' by which the worker completes [his] assigned tasks.'" Id. (quoting Eisenberg, 237 F.3d at 117).


b. Application of the Law to Yu


Defendants point to several factors in arguing that Yu was an independent contractor. First, they view Yu's statements that Mariconda promised that he would become an employee (Compl. at ¶¶ 24, 108; see also Pl. Dep. at 300:23-24), that he was willing to become an employee of HDC (Compl. at ¶ 111), and that HDC discriminated against him by failing to make him an employee (see Compl. at ¶ 146; see also Pl. Dep. at 294:4-8) as implicit concessions that Yu was never an employee of HDC and was in fact an independent contractor. (Defs.' Mem. of Law at 4). Second, they point to plaintiff's contract with HDC, which specifically states that "Consultant [Yu] is acting as an independent contractor and not as an employee of HDC in performing his services hereunder." (Defs.' Mem. of Law at 5 (quoting McConnell Decl. at Ex. 5, ¶ 5).

72

Third, they analyze several of the <u>Reid</u> factors, including (1) plaintiff's tax treatment, (2) his lack of benefits, (3) his control over his hours and the location of his work, and (4) the non-exclusivity and time-limited nature of his contract with HDC, and conclude that these factors taken as a whole establish that plaintiff was an independent contractor.

Plaintiff responds by pointing to several facts weighing in favor of finding that he was an employee of HDC: (1) HDC provided him with a laptop computer, Blackberry, and other tools and instrumentalities with which to perform his work, as they did with their employees (Pl.'s Mem. of Law at 6; Pl.'s Aff. at ¶¶ 188-192); (2) plaintiff generally worked full-time during regular business hours (Pl.'s Mem. of Law at 6); (3) due to the number of hours he was required to work at HDC, he was unable to work for any other employer (Pl. Dep. at 145:17-146:3[34]); (4) his job title and work assignments were essentially the same as those of Kar and Patibandla, both of whom were employees of HDC (Pl.'s Mem. of Law at 5-6); and (5) Mariconda was responsible for assigning particular tasks to plaintiff and the rest of the IT Department, determining which (if any) of plaintiff's suggested projects would be

---

[34] Silverberg Decl. at Ex. D.

73

implemented, and approving plaintiff's work. (Pl.'s Mem. of Law at 6).

At the outset, we must address defendants' argument that Yu has implicitly conceded that he was an independent contractor, thereby essentially abdicating most of his claims. While Yu did in fact allege that HDC and Mariconda discriminated against him by failing to make him an employee, we do not give this allegation the legal significance that defendants request, particularly in light of plaintiff's pro se status and his apparent difficulties with the English language even when not dealing with terms (such as "employee") that have a different significance in the legal realm than they do in everyday speech. Reading plaintiff's submissions to raise the strongest arguments they suggest (as we must, Wali, 678 F.Supp.2d at 177), we take him to argue that (1) he was in fact an employee of HDC, not an independent contractor, albeit one with an expressly limited term of employment; and (2) HDC and Mariconda discriminated against him when they refused to make him a permanent employee -- i.e., one who had no set end date to his employment contract and was entitled to benefits -- while giving younger, non-Chinese workers in the same position permanent status and benefits.

Second, defendants' argument that plaintiff's employment

74

status was agreed upon in the Consulting Agreement is without
merit. "[T]he right to be treated in a non-discriminatory manner
does not depend on the terms of any particular contract."
Eisenberg, 237 F.3d at 116. Employers cannot simply contract their
way around the antidiscrimination laws, since these laws create
rights that "are not subject to waiver or sale." Id. (citing
Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728
(1981)). Thus, "employment contracts, no matter what the
circumstances that justify their execution or what the terms, may
not be used to waive protections granted to an individual under
[Title VII] or any other [A]ct of Congress." Id. at 117 (quoting
Spirides v. Reinhardt, 613 F.2d 826, 832 (D.C. Cir. 1979)). In
order to determine plaintiff's employment status -- and the extent
of his protection under the antidiscrimination laws -- we must
examine the Reid factors.

In doing so, we can quickly eliminate two factors which are
either irrelevant or indeterminate. First, since Yu never worked
with assistants, their hiring and payment (factor 9) is irrelevant.
Next, we find that the duration of the relationship between the
parties (factor 5) does not weigh strongly in either direction. As
in Rohn Padmore, Inc. v. LC Play, Inc., 679 F.Supp.2d 454, 467
(S.D.N.Y. 2010), plaintiff's employment was "intended to be for a

75

fixed period of time, but was not for such a short duration as to indicate that [plaintiff] was not an employee."

The tenth and eleventh <u>Reid</u> factors -- whether HDC was in business and whether Yu was "performing tasks that directly relate to the objective of the hiring party's business," <u>id.</u> (quoting <u>Aymes v. Bonelli</u>, 980 F.2d 857, 863 (2d Cir. 1992)) -- point in conflicting directions and are, in any event, largely unhelpful. HDC is a public benefit corporation in the business of increasing the supply of affordable housing in New York City. The fact that a party was in business, however, "indicates nothing about whether [plaintiff] was an employee in that business." <u>Aymes</u>, 980 F.2d at 863. Yu's work for HDC was not directly related to its business, as he was a member of their support personnel. Since "most companies hire numerous support personnel such as . . . computer programmers," <u>id.</u>, the fact that plaintiff did not work in HDC's regular business "is not strongly indicative of whether he was an independent contractor," <u>id.</u>, particularly in light of the fact that HDC treated other programmers in the IT Department -- including Kar and Patibandla, each of whom held essentially the same position as plaintiff -- as employees.

Defendants are correct that plaintiff's tax treatment (factor

13) -- specifically, the fact that his income was reported on a Form 1099 rather on a W-2 -- weighs in defendants' favor.[35]  His lack of benefits (factor 12) also weighs against finding that he was an employee of HDC. Plaintiff is correct, however, that these factors are given little weight in the ultimate analysis, since they are easily manipulated by employers seeking to deny their workers employee status. Eisenberg, 237 F.3d at 115-17; Rohn Padmore, Inc., 679 F.Supp.2d at 468 (citing Eisenberg, 237 F.3d at 117). Moreover, the fact that the IRS determined that plaintiff was an employee, despite defendants' use of a Form 1099, strongly suggests that we should not give defendants' tax treatment of plaintiff significant weight. See Rumpke v. Rumpke Container Serv., Inc., 240 F.Supp.2d 768, 775 (S.D. Ohio 2002) ("The Court finds the 1992 determination of the IRS [that plaintiff was an employee] to be persuasive.").

The skill required for plaintiff's position (factor 2) weighs strongly in favor of finding that he was an independent contractor. Plaintiff had two master's degrees and several years of experience as an Oracle programmer and DBA, and this skill was a key

---

[35] Independent contractors typically utilize Form 1099, whereas employees utilize Form W-2. Perfect Dental, PLLC v. Allstate Ins. Co., 538 F.Supp.2d 543, 545 n. 3 (E.D.N.Y. 2007); see also Eisenberg, 237 F.3d at 118.

qualification for his position. Moreover, computer programmers have been found to be independent contractors in several other cases, based at least in part on the skill required for the position. See, e.g., Graham v. James, 144 F.3d 229, 235 (2d Cir. 1998); Aymes, 980 F.2d at 862 (citing MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769, 777 (3d Cir. 1991)). It also appears that, in the years immediately prior to plaintiff's employment at HDC, he was able to market his skills as a freelance Oracle consultant (see Pl. Ex. J at D000025), another consideration that weighs in favor of finding him to be an independent contractor.

On the other hand, we find that plaintiff had very limited discretion over when and how long to work (factor 7) and where to work (factor 4), and this suggests that plaintiff was an employee of HDC, or at least it does not point towards independent-contractor status. While plaintiff had the capacity to work from home and control his own hours, he almost exclusively worked on HDC's premises during regular business hours, and he testified at his deposition that he did so at Mariconda's request. It is also clear that when plaintiff came close to exceeding his budgeted hours, Mariconda requested that he take several days off. Given the amount of time plaintiff was asked to work, the control that

78

defendants exerted over the total hours he spent working, defendants' request that plaintiff be present at HDC during business hours, the possibility that he could be called to respond to an emergency in his off-hours (thus further restricting his discretion on when to perform his work-related tasks), and the near-constant communication with the rest of the IT Department that was apparently required in his position, it is clear that plaintiff's discretion over his hours and work location was limited.

HDC's right to assign additional projects (factor 6) weighs in favor of plaintiff's contention that he was an employee. The contract between the parties was not limited to a specific project, but "covered a broad array of services [plaintiff] was to perform," similar to that at issue in Rohn Padmore, Inc., 679 F.Supp.2d at 467. The Court in Rohn Padmore, Inc. found that such a contract was "not helpful" in determining employment status. Id. However, in Eisenberg, the Second Circuit stated that "[i]ndependent contractors are typically hired only for particular projects," 237 F.3d at 119 (quoting Aymes, 980 F.2d at 863), and found that the sixth factor weighed in favor of employee status where the plaintiff "was not hired for a specific . . . project" and was instead assigned to "whatever . . . projects [the employer]

79

undertook while she was there." 237 F.3d at 118-19. Here, HDC's
internal contract approval form stated that plaintiff would be
hired for a "Consulting Project for Oracle." (Pl.'s Ex. at
D000022). This was ostensibly a single project, but contained a
plethora of additional assignments and individual tasks, all of
which were presumably assigned to plaintiff by Mariconda. This type
of relationship -- as opposed to a situation where a contractor is
hired for a single project with well-defined limits, and the
employer has no discretion to assign additional work without
negotiating additional payment -- suggests that plaintiff was an
employee and not an independent contractor, particularly where two
others who performed essentially the same work for HDC were
considered employees.

Defendants supplied plaintiff with the instrumentalities and
tools with which he was to accomplish his tasks (factor 3),
specifically, the desktop computer, laptop, and Blackberry, in
addition to office supplies and additional work-related
paraphernalia. This factor, too, weighs against defendants. So does
the fact that plaintiff was paid an hourly rate based on his
submitted timesheets (the "method of payment," factor 8).
"Compensation primarily or exclusively on the basis of time worked
(rather than on the basis of projects completed) suggests that a

80

worker is an employee." <u>Eisenberg</u>, 237 F.3d at 119; <u>see also</u> <u>Aymes</u>, 980 F.2d at 863 (2d Cir. 1992).

Hence our analysis of the bulk of the <u>Reid</u> factors does not find a clear indication that Yu was an independent contractor. The same is true of the key factor in an antidiscrimination case: the extent to which the employer controls the "manner and means" by which the worker performs his task. <u>Salamon</u>, 514 F.3d at 226. Perhaps significantly, defendants' motion does not address this <u>Reid</u> factor, and we must therefore independently examine the record for evidence regarding the extent of HDC's control over the manner and means by which Yu performed his work as a programmer. In analyzing this factor, "[t]he issue is the balance between the employee's judgment and the employer's control." <u>Id.</u> at 229.

As in <u>Salamon</u>, it appears that defendants "exercised substantial control not only over the . . . outcomes . . . but over the details and methods of [plaintiff's] work." <u>Id.</u> Plaintiff has presented uncontradicted evidence that Mariconda had extensive authority to direct his daily and weekly assignments, that Mariconda would often transfer assignments between plaintiff and Patibandla or Kar (who were concededly employees of HDC), and that Mariconda regularly ignored or refused to follow plaintiff's

81

judgment as to the appropriate course of action in maintaining HDC's Oracle databases. In fact, two of the reasons given for plaintiff's termination were that he "[d]id not complete his projects which are detailed out every Monday during our weekly DBA meeting" and that he "[d]id not follow instruction[s] well and often [deviated] from his assigned tasks." (Pl.'s Ex. G, at D000016).

These facts show, at the very least, that a reasonable jury could find that HDC and Mariconda had not only the prerogative to determine the objective of Yu's work -- stable and functional Oracle databases and applications -- but also the ability to define which tasks plaintiff would undertake to accomplish their goal, and how and when he would undertake them. Cf. Eisenberg, 237 F.3d at 114 ("[U]nder the common law of agency, 'an employer-employee relationship exists if the purported employer controls or has the right to control both the result to be accomplished and the 'manner and means' by which the purported employee brings about that result.'") (quoting Hilton Int'l co. v. NLRB, 690 F.2d 318, 320 (2d Cir. 1982)). Hence we find that there is a genuine dispute of material fact with regard to Yu's status as an employee of HDC -- that is to say, a reasonable jury could find that Yu was an employee of HDC and not an independent contractor -- and we

recommend that the court not grant summary judgment on this ground.

We therefore turn to our assessment of the merits of plaintiff's discrimination claims, under the now-familiar burden-shifting analysis.

### 3. Assessment of Plaintiff's Discrimination Claims

Under Title VII, an employer or potential employer may not "discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, the ADEA forbids employers to "discharge . . . or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA protects only those persons who are 40 years of age or older. Id. at § 631; Woodman, 411 F.3d at 76.

To establish a claim for disparate treatment under Title VII in the absence of direct evidence of discrimination, the plaintiff must demonstrate both that he was subjected to an adverse employment action and that his race, color, religion, sex, or national origin was a motivating factor in the action. See, e.g., Reeves, 530 U.S. at 141. A similar analysis applies under the ADEA,

83

except that "'a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action' and not just a contributing or motivating factor." Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 106 (quoting Gross v. FBL Fin. Servs., 129 S.Ct. 2343, 2352 (2009)). Under both statutes, we apply the three-step burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to analyze plaintiff's claims of discrimination. Gorzynski, 596 F.3d at 106; Weinstock, 224 F.3d at 42.

The first step in this analysis involves examination of the plaintiff's proof of a prima facie case of discrimination, see, e.g., Reeves, 530 U.S. at 142; Gorzynski, 596 F.3d at 106, Windham v. Time Warner, Inc., 275 F.3d 179, 187 (2d Cir. 2001), which is a "minimal" burden. See McPherson v. New York City Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006). A plaintiff need only demonstrate (1) that he belongs to a protected class; (2) that he was qualified for the position in question; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination based on membership in the protected class.

See Gorzynski, 596 F.3d at 106 (ADEA); Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005) (Title VII) (citing, inter alia, McDonnell Douglas Corp., 411 U.S. at 802).

If plaintiff carries his prima facie burden, the defendant is required to articulate a neutral, or non-discriminatory, reason for its actions. See, e.g., Reeves, 530 U.S. at 142; Weinstock, 224 F.3d at 42. "The employer need not persuade the Court that the proffered reason was the actual reason for the adverse action; rather the employer's burden is simply to rebut the plaintiff's prima facie case by clearly setting forth, 'through the introduction of admissible evidence, the reasons for the [adverse action against the plaintiff].'" Wali v. One Source Co., 678 F.Supp.2d 170, 180 (S.D.N.Y. 2009) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981)) (brackets in original).

If defendant does so, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that defendant's explanation was but a pretext, and that discriminatory animus was in fact a motivating factor in (for Title VII claims) or the but-for cause of (for ADEA claims) the adverse employment action. See Reeves, 530 U.S. at 143; Gorzynski, 596 F.3d at 106; Weinstock, 224

85

F.3d at 42. "A reason given by an employer for its action cannot be proven to be pretextual unless the plaintiff shows that the reason was false and that discrimination was 'the real reason.'" Wali, 678 F.Supp.2d at 180 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). Hence, "[a]t the summary judgment phase, the plaintiff 'must establish a genuine issue of material fact . . . as to whether the employer's reason for the adverse action is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse decision.'" Id. (quoting Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994)).

Thus, to survive a summary-judgment motion, the plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." Weinstock, 224 F.3d at 42 (internal quotation marks and brackets omitted) (alterations in original) (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)). Such evidence can take a number of forms. It may be circumstantial and may include that which was proffered to establish plaintiff's prima facie case. See Reeves, 530 U.S. at 143. Moreover, if plaintiff's

86

prima facie case is strong, that evidence may be sufficient to raise a question of fact about the true motivation for the complained-of employment action, in which case plaintiff would not be required to proffer further proof to survive summary judgment. See id. at 143. We will also consider, however, "the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Id. at 149.

"[A]n extra measure of caution is needed in awarding summary judgment to a defendant where, as in a discrimination case, intent is at issue." Wali, 678 F.Supp.2d at 180 (citing Gallo, 22 F.3d at 1224). Since "[a]n employer's records will rarely document the state of mind or motives of its decision-makers," the plaintiff's proffered evidence "'must be carefully scrutinized' for circumstantial evidence about the employer's state of mind and those factors that motivated the challenged action." Id. (quoting Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996)). Nevertheless, it is clear that "summary judgment remains available for the dismissal of discrimination claims lacking genuine issues of material fact." Id. (quoting McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997)).

Insofar as plaintiff asserts comparable claims under sections 1981 and 1983, the analysis is roughly the same. See, e.g., Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006) (section 1983); Gant ex rel. Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 146 (2d Cir. 1999) (section 1981). We also apply the same criteria to his discrimination claims under the NYSHRL and NYCHRL.[36] See Gorzynski, 596 F.3d at 106 n.6 ("we assume, without deciding, that the Supreme Court's Gross decision affects the scope of the NY[S]HRL law [as applied to age discrimination claims] as well as the ADEA."); Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000) (citing cases).

---

[36] New York City recently enacted the Local Civil Rights Restoration Act, N.Y.C. Local Law No. 85 of 2005, § 1 (Oct. 3, 2005), which amended several provisions of the NYCHRL and stated that it should be "construed independently from similar or identical provisions of New York state or federal statutes". Id.; see also Ochei v. Coler/Goldwater Memorial Hosp., 450 F.Supp.2d 275, 282-83 (S.D.N.Y. 2006) Hence, it is unclear whether New York courts would follow the U.S. Supreme Court's Gross decision in applying a "but-for causation" test to claims of age discrimination under the NYCHRL, or would analyze such claims under the more permissive "motivating factor" test that remains prevalent under Title VII, or would utilize some even-more-lenient standard. Courts have continued, however, to apply the McDonnell Douglas burden-shifting framework under the new law. See Ochei, 450 F.Supp.2d at 283; Jordan v. Bates Adver. Holdings, Inc., 11 Misc. 3d 764, 771, 816 N.Y.S.2d 310, 318 (N.Y. Sup. Ct. N.Y. Cty. 2006). Since our analysis of Yu's claims under this framework leads us to conclude that they could not survive even the less-stringent "motivating factor" analysis, see below at pp. 89-106, we need not reach the issue of whether the amended NYCHRL incorporates Gross.

a. <u>Yu's Prima Facie Case</u>

Yu has established that he is of an age and national origin protected under the anti-discrimination laws. Defendants contend, however, that he has failed to establish the remaining prongs of his <u>prima</u> <u>facie</u> case.

Defendants first argue that plaintiff was not subject to any adverse employment action. Next, assuming that plaintiff did suffer an adverse employment action, defendants assert that it did not take place under circumstances giving rise to an inference of discrimination. Finally, defendants assert that Yu cannot establish that he satisfactorily performed his duties. We examine each argument in turn, but address Yu's performance before assessing the possible inference of discriminatory intent.

1. <u>Adverse Employment Action</u>

Plaintiff appears to contend that he suffered three adverse employment actions: first, he was given unfavorable assignments by Mariconda; second, he was denied a promotion to the permanent Oracle Apps/DBA position after Patibandla resigned in lieu of being fired; and third, he was terminated. He contends that each of these

89

actions was discriminatory, and was based on animus towards his age and national origin.

Defendants focus on plaintiff's complaint about their failure to promote him to permanent employee status. They contend that plaintiff never suffered an adverse employment action in this respect, since his job title and duties remained substantially the same after Kar was promoted to Patibandla's position. (Defs.' Mem. of Law at 10-12). "A tangible adverse employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Richards-Byers v. New York City Dept. of Finance, 2010 WL 2834893, at *7 (S.D.N.Y. July 7, 2010) (citing Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998)). Insofar as plaintiff's discrimination claim is based on HDC's failure to promote him to permanent employee status when Patibandla's position became vacant, failure to promote a qualified employee can be an adverse employment action. See, e.g., Hall v. New York City Dept. of Transp., 701 F.Supp.2d 318, 334 (E.D.N.Y. 2010) ("[A] failure-to-promote is clearly an adverse employment action."). It is true that after Kar's promotion, plaintiff's job responsibilities, employment status, salary, and benefits (or lack thereof) remained the same.

90

It is also true that Kar's salary as Apps/DBA was lower than
plaintiff's potential maximum annual earnings under his contract,
although at least some of this amount would be made up by the fact
that Kar received employee benefits. We note, however, that
defendants' vehement assertions that plaintiff was an independent
contractor and therefore unprotected by the laws under which he
brings this action suggest that they believed plaintiff's position
to be less favorable than the position held by Kar and Patibandla
in at least one material respect, and this is sufficient to carry
plaintiff's minimal burden on his prima facie case. Plaintiff has
therefore, at the very least, raised a genuine issue of material
fact as to whether this action was adverse.

Plaintiff's discrimination claims are also based on his
termination. Defendants do not suggest that termination is not an
adverse employment action, perhaps because such an argument would
be frivolous.

To the extent that plaintiff also claims that defendants
discriminated against him by giving him unfavorable work
assignments, however, we find that plaintiff has failed to
establish a genuine issue of material fact. Plaintiff's repeated
assertions that he was given the same assignments as Patibandla and

91

Kar -- usually, according to the plaintiff, after they had found
that they could not complete the task -- do not permit the
inference that his work assignments differed so substantially from
either Patibandla's or Kar's as to constitute an adverse employment
action. We therefore consider only plaintiff's "failure-to-promote"
and termination claims as potentially establishing a prima facie
case of discrimination.


2. Satisfactory Job Performance


Defendants also assert that plaintiff cannot show that he
performed his job satisfactorily, and point to Mariconda's
statements that plaintiff lacked the required communications
skills. (Defs.' Mem. of Law at 12-13). Given that defendants
employed plaintiff in the Oracle DBA position for nearly a year,
and that plaintiff essentially shared the responsibilities of the
Oracle Apps/DBA position between Patibandla's resignation and
plaintiff's termination, we find that plaintiff has at least raised
a genuine issue of material fact as to whether he performed his job
satisfactorily. See Mattera, ___ F.Supp. 2d at ___, 2010 WL
3785576, at *8 (quoting Slattery v. Swiss Reinsurance America
Corp., 248 F.3d 87, 92 (2d Cir. 2001) ("The standard [for the
qualification prong of the prima facie case] . . . is whether

92

plaintiff possessed the 'basic skills necessary for performance of
[the] job."). "Indeed, it is 'error to find that plaintiff has not
established his prima facie case merely because employer was
dissatisfied with plaintiff's performance." Id. (quoting Chukwurah
v. Stop & Shop Supermarket Co., LLC, 354 Fed. Appx. 492, 494-95 (2d
Cir. 2009)). Moreover, we find that defendants' contentions are
more appropriately considered after plaintiff has established his
prima facie case, in the context of our pretext analysis of their
non-discriminatory reasons for any adverse employment action, and
hence we do not recommend summary judgment on this basis.

### 3. Inference of Discrimination

Finally, defendants contend that Yu cannot establish that he
was passed over for the permanent Apps/DBA position and later fired
under circumstances giving rise to an inference of discrimination.
As we understand them, plaintiff's allegations regarding an
inference of discrimination come in several forms. First, he states
without contradiction that both Kar and Patibandla, who held the
permanent position he desired, were of Indian national origin and
in their thirties; second, he points to two other members of the IT
Department (Antao and Sivaprakasam) who were promoted from
independent contractor status to employee status, both of whom were

outside of his protected class and one of whom was of Indian national origin; and third, he notes that several other members of the IT Department, including at least two with some hiring authority (Kulkarni and Varghese), were either of Indian national origin or much younger than he, or both. We therefore understand plaintiff's failure-to-promote claim to rely on disparate treatment between himself and the younger, non-Chinese members of the IT Department, particularly Antao and Sivaprakasam, who were granted permanent employee status. We also understand plaintiff to rely on disparate treatment between himself and Kar (and perhaps Patibandla), who were given permanent employee status in the Oracle DBA and Apps/DBA positions that plaintiff shared.

Similarly, we understand plaintiff's termination claim to again allege disparate treatment on the basis of age and national origin, relying largely on the fact that Kar and Patibandla -- each of whom, plaintiff alleges, was incapable of performing the Apps/DBA job -- were given permanent employee status and, in Kar's case, was allowed to remain at HDC while plaintiff was terminated.[37]

_____

[37] Plaintiff also refers to Mariconda's attitude towards him after his first confrontation with Patibandla and several remarks by other members of the IT Department. Since he never alleges that Mariconda's attitude was in any way based on his age or national origin, but only changed after his failure to communicate adequately with another employee, and since the

An employee can establish an inference of discrimination by several means, including "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." Wali, 678 F.Supp.2d at 180 (quoting Graham v. Long Island R.R., 230 F.3d 34, 38-39 (2d Cir. 2000)). If the plaintiff seeks to show disparate treatment, he must show that he "was similarly situated in all material respects to the individuals with whom he seeks to compare himself." Id. at 180-81 (quoting Velez v. SES Operating Corp., 2009 WL 3817461, at *8 (S.D.N.Y. Nov. 12, 2009)). "Generally, the question of whether two employees are similarly situated is a triable issue for the fact finder." Hayes v. Kerik, 414 F.Supp.2d 193, 204 (E.D.N.Y. 2006) (citing, inter alia, Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003)).

---

documentary evidence reflecting Mariconda's treatment of plaintiff -- as well as plaintiff's testimony that he and Mariconda discussed plaintiff's daughter's college graduation the morning he was terminated -- shows no actual change in attitude, this allegation is insufficient to give rise to an inference of discrimination. Similarly, plaintiff alleged that the attitude of several members of the IT Department changed after he was not given a permanent position, but, as defendants point out, this change was apparently based on his employment status, not his age or national origin, and none of the particular comments about which he complains were attributable to Mariconda. (Defs.' Mem. of Law at 14). Finally, Kulkarni's comments that plaintiff looked too young to have a daughter in college, and her later questions as to how she could educate her own children as well as plaintiff had educated his (Pl.'s Aff. at ¶¶ 343-44) are so inoffensive that they in no way give rise to an inference of discrimination.

"Nonetheless, a plaintiff must offer sufficient evidence from which a jury could reasonably conclude that there was indeed disparate treatment of similarly situated employees." Id. (citing cases).

Defendants assert that plaintiff was not similarly situated to Kar because Kar was an employee while plaintiff was an independent contractor. (Defs.' Mem. of Law at 16). Given our finding that there is a genuine issue of material fact as to whether plaintiff was in fact an employee of HDC, this contention does not defeat plaintiff's prima facie case. Defendants also assert that plaintiff was not similarly situated to either of the contractors offered permanent positions, due to the fact that both had worked at HDC for significantly longer than plaintiff, and they argue that discrimination based on length of tenure is permissible. There is no evidence, however, that the decision to promote either contractor was based in any part on the length of their tenure at HDC, or that the decision to pass over and later terminate plaintiff was based in any way on the length of his tenure at HDC. We are therefore unable to conclude that length of tenure is a material difference between plaintiff and Antao or Sivaprakasam, and find that plaintiff has raised a genuine issue of material fact as to whether he was similarly situated to them. Plaintiff contends that these assertedly similarly-situated employees were offered

permanent positions at HDC while he was denied one. That is
sufficient to raise an inference of discrimination on the failure-
to-promote claim, given plaintiff's minimal burden on his prima
facie case.

Plaintiff also appears to contend that these allegedly
similarly-situated employees were allowed to remain at HDC despite
their rank incompetence, while he was terminated, and that this
disparity in treatment suggests that his termination was animated
by impermissible discriminatory motives. However, even viewing the
evidence in the light most favorable to the plaintiff, we cannot
say that he has raised a genuine issue of material fact as to the
qualifications of any member of the IT Department. The materials
plaintiff has submitted simply do not reflect these employees'
inability to fulfill the requirements of the job, despite
plaintiff's vehement (and conclusory) allegations to the contrary.
We cannot, therefore, conclude that plaintiff has raised a genuine
issue of material fact as to whether he was terminated under
circumstances giving rise to an inference of discrimination. We
therefore recommend that defendants' motion for summary judgment be
granted on plaintiff's discrimination claims insofar as they are
based upon his termination.

97

    Defendants provide additional support for this conclusion by
noting that Mariconda was responsible for hiring as well as firing
plaintiff and denying him a promotion. "[W]hen the person who made
the decision to fire was the same person who made the decision to
hire, it is difficult to impute to [him] an invidious motivation
that would be inconsistent with the decision to hire. This is
especially so when the firing has occurred only a short time after
the hiring." Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d
Cir. 1997) (citing cases); see also Renz v. Grey Advertising, 135
F.3d 217, 224 (2d Cir. 1997) (age-discrimination plaintiff could
not succeed, in part because allegedly biased supervisor who
terminated plaintiff's employment had hired her less than two years
earlier).


    Plaintiff attempts to counter this contention by claiming that
Mariconda did not know his age when he was hired, due to the fact
that he looks younger than he is. The only evidence he submits for
this proposition, however, is a stray remark by Kulkarni to the
effect that plaintiff did not look old enough to have a daughter in
college, and the fact that shortly before his firing, he discussed
his daughter's college graduation with Mariconda. He does not
allege that either Mariconda or Kulkarni said anything negative
about his age -- in fact, he alleges that Kulkarni asked his advice

on educating her children after finding out that his daughter
attended a top school -- or that any other member of the department
made any discriminatory remarks about his age or about older
employees in general.

Plaintiff does point out that numerous IT Department employees
were in their twenties or thirties, and that three IT Department
employees who left HDC during or in close proximity to his tenure
(Palanappian, Varghese, and Yau) were over forty years old and thus
potentially protected by the ADEA. He does not, however, allege
that any of them were fired because of their age, nor did he depose
any of them to ask whether they believed that they were
discriminated against on the basis of age, or seek any other
evidence of discrimination against them. In fact, the evidence he
did submit establishes that one of the three resigned voluntarily,
and another left HDC at the end of her contract term after working
there for close to thirty years. In short, plaintiff can point to
nothing to support his age-discrimination claim beyond the relative
ages of some of the members of HDC's IT Department and the fact
that Kar was thirty-five years old when he was promoted. Even if
this were sufficient to raise an inference that age was a factor in
hiring in HDC's IT Department and thus perhaps in plaintiff's
termination, it cannot lead to the inference that age was the but-

for cause of either plaintiff's termination or Mariconda's failure to promote him, a necessary finding under the ADEA after Gross. We therefore recommend that the district court grant plaintiff's motion for summary judgment on his age discrimination claims, as he cannot establish a prima facie case of discrimination.[38]

Plaintiff does not even contend that Mariconda was unaware of his national origin when he was hired, making defendants' argument that Mariconda cannot possibly have been biased even stronger. We find, however, that plaintiff's evidence of national origin discrimination is marginally stronger, given the fact that both occupants of the job he sought were of Indian national origin, as were several other members of HDC's IT Department, including at least one decision-maker. It is a close question, but we find that plaintiff has established, if barely, a genuine issue of material fact as to whether Mariconda's failure to promote him and to later terminate him give rise to an inference of discrimination based on national origin. He has therefore established a weak prima facie

---

[38] To the extent that plaintiff's age-discriminatino claims arise under the NYSHRL and NYCHRL and therefore might be evaluated under the more lenient "motivating-factor" standard, our conclusion remains the same: plaintiff has failed to adduce evidence sufficient to raise the inference that age was a motivating factor in any adverse employment action, and we therefore recommend that his claims be dismissed.

100

case of national-origin discrimination, and hence we turn to defendants' proffered legitimate reasons for their actions and plaintiff's contentions of pretext.

> b.   HDC's Non-Discriminatory Reason for their
> Actions and Yu's Allegations of Pretext

In explaining their decision not to promote plaintiff and ultimately to terminate him, defendants point to plaintiff's poor communication skills, and his lack of professionalism and teamwork. These are legitimate, non-discriminatory reasons for defendants' actions, and they find ample support in the record submitted on this motion. For example, the day before plaintiff was fired, he proposed performing several patches on the server called "Newton," and asked for an update on Newton's current patch status.  (Pl.'s Ex. J, at D002435-36). Mariconda responded, informing plaintiff that Kar was working on Newton, and told plaintiff to obtain an update from Kar, who Mariconda cc'd on the email. (Id. at D002435). Kar responded within ten minutes, with an email that stated, "[h]ere is NEWTON['s] current patch status." (Id.). Rather than accept this response, plaintiff questioned whether it was accurate. (Id.). The next morning, plaintiff sent an email asking why Newton was down (Pl.'s Ex. J at D002432), despite the fact that he had

101

been assigned to work on a project that did not involve the server. (Pl.'s Aff. at ¶ 776; Pl's Dep. at 292:10-18; Pl.'s Ex. J at D000858). When Kar responded that he was patching Newton, plaintiff emailed back, reprimanding Kar for not first verifying the patch status he had sent the previous day, then telling Kar that they should discuss the matter before Kar continued with his work. (Pl.'s Ex. J at D002432). It appears that plaintiff assumed that Mariconda had given him the go-ahead on his proposal from the previous day, despite the fact that Mariconda's response email had done no such thing, and that plaintiff was unsure why Kar was preventing him from doing so.

It also appears that, despite plaintiff's insistence that only Mariconda could assign projects to him, he was quite confident he had the authority to give orders to Kar. At a meeting shortly after this exchange, plaintiff refused to work on anything beyond his current project until Kar re-verified Newton's patch status, presumably so that plaintiff could begin his own patch of Newton. (Pl.'s Aff. at ¶¶ 779-81; see also Pl. Dep. at 292:19-23). Mariconda informed plaintiff that he was terminated shortly after the conclusion of this meeting, citing plaintiff's poor communication skills and his lack of professionalism and teamwork. Since defendants have provided legitimate, non-discriminatory

102

reasons for plaintiff's termination (and their decision not to
promote him), we require plaintiff to demonstrate that these
reasons were but a pretext for discrimination.


    In a failure-to-promote claim, "[a] plaintiff may defeat
summary judgment when his employer rebuts the prima facie case by
coming forward with sufficient evidence from which a reasonable
juror could conclude that his credentials are so superior to the
credentials of the person selected for the job that no reasonable
person, in the exercise of impartial judgment, could have chosen
the candidate selected over the plaintiff for the job in question."
Dent v. U.S. Tennis Ass'n, 2011 WL 308417, at *5 (E.D.N.Y. Jan. 27,
2011) (quoting Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d
93, 103 (2d Cir. 2001) (internal quotation marks omitted)).


    Plaintiff's allegations that he was more qualified than Kar --
in effect, that Kar totally lacked any qualifications for the job
-- appear intended to show pretext by showing that no reasonable
person would have promoted Kar over plaintiff. However, these
allegations are not only entirely conclusory and unsupported by any
competent evidence, but are thoroughly refuted by the evidence
submitted by the parties. Kar had only slightly less experience as
an Oracle DBA and Apps/DBA than plaintiff himself, and had glowing

103

reviews of his performance in that role from his previous
employers. What little evidence plaintiff submitted to attempt to
establish Kar's incompetence is largely quoted out of context and,
read in its entirety, can far more reasonably be read to establish
the opposite. For example, plaintiff selectively cites an email
string, including an email from Kar, to support his assertion that
"Kar was 'stumbled' on Apps/DBA's README from Oracle Corporation
[and] needed a condensed, highlighted instruction in plain English
. . . to follow up and do his basic and simple Apps/DBA's job."
(Pl.'s Rule 56.1 Statement at ¶ 22 (citing, <u>inter alia</u>, Pl.'s Aff.
at ¶¶ 602-06). An examination of the email string itself, however,
shows that Kar used the expression that he had "stumbled on" a
problem to state that he had unexpectedly come across an issue, and
he went on to explain that he had found a solution for the problem
(despite plaintiff's insistence that it was not a problem at all,
because it did not appear in Oracle's Patch Documentation), but
nevertheless flagged it for review by Mariconda and an on-site
Oracle consultant. (<u>See</u> Pl.'s Ex. K, at D000724)). This reflects
not only technical competence but strong communication skills on
Kar's part.

To the extent that plaintiff contends that he should have been
selected for the permanent Apps/DBA position because he had been at

HDC for significantly longer, "[e]xperience . . . is not a substitute for performance, and defendants had every right to place greater emphasis on the performance evaluations of the candidates for promotion." Estate of Hamilton v. City of New York, 627 F.3d 50, 56 n. 7 (2d Cir. 2010) (citing and quoting Byrnie, 243 F.3d at 103) ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second-guesses employers' business judgments."). Moreover, plaintiff submits no evidence to establish that length of tenure at HDC was a relevant job qualification. We therefore find that no reasonable jury could conclude that defendants' proferred reasons for Kar's promotion were pretextual, and recommend that defendants be granted summary judgment on his remaining claims of discrimination.

Similarly, even assuming plaintiff had established a prima facie case of discrimination with regard to his termination, the context of his termination in no way suggests that defendants' proferred reason was but a pretext for a discriminatory motive. In fact, Patibandla, an employee of Indian national origin and one who we understand plaintiff to allege was protected by Mariconda in a discriminatory manner, was fired by Mariconda less than two months before plaintiff, and for largely the same reasons given for plaintiff's termination (poor communication skills and lack of

professionalism). Plaintiff's allegations of pretext amount largely
to conclusory statements that the only possible reason for his
termination was discriminatory animus. For example, the last
several pages of plaintiff's affidavit are an attempt to refute
defendants' declarations to the court by a paragraph-by-paragraph
recitation of the conclusory allegation that they are pretext for
discrimination and retaliation. (See generally Pl.'s Aff. at pp.
65-81). This cannot suffice to defeat summary judgment.

    We therefore recommend that defendants' motion for summary
judgment be granted as to the remainder of plaintiff's
discrimination claims.[39]

E. Retaliation Claims

    Plaintiff also claims that his termination was in retaliation
for his complaints about Mariconda's previous discriminatory
actions. We evaluate retaliation claims under a burden-shifting

_____

[39] To the extent that Mariconda could be held individually
liable under the NYSHRL either individually or as an aider and
abettor of HDC's discrimination, see above at p. 65, we recommend
dismissal of this claim in light of our finding that neither he
nor HDC discriminated against plaintiff. Furthermore, even if
plaintiff had not effectively abandoned his claims of race
discrimination, this analysis would lead us to recommend
dismissal of those claims as well.

rubric similar to that invoked to analyze discrimination claims. "First, the plaintiff must establish a prima facie case of retaliation by showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Isaac v. City of New York, 701 F.Supp.2d 477, 489-490 (S.D.N.Y. 2010) (evaluating claims of retaliation in violation of Title VII and 42 U.S.C. § 1981) (quoting Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010)); see also Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006) ("[R]etaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII.") (citing cases); Ibok v. Securities Industry Automation Corp., 369 Fed. Appx. 210, 214 (2d Cir. 2010) ("[The NYCHRL] also forbids retaliation and must be applied at least as broadly as its federal counterpart.") (citing Loeffler v. Staten Island University Hosp., 582 F.3d 268, 278 (2d Cir. 2009)); Marinelli v. Chao, 222 F.Supp.2d 402, 418 (S.D.N.Y. 2002) (same analysis under the ADEA). The plaintiff's burden at the prima facie case state is de minimis. Isaac, 701 F.Supp.2d at 490 (quoting Hicks, 593 F.3d at 164). "If the plaintiff establishes a prima facie case, the burden shifts to defendants to 'articulate a legitimate, non-retaliatory reason for the adverse employment action.'" Id. (quoting Hicks, 593 F.3d at

164). "If [they do] so, the presumption disappears and the plaintiff carries the burden of establishing that 'retaliation was a substantial reason for the adverse employment action.'" Id. (quoting Hicks, 593 F.3d at 164). As with Title VII claims, plaintiff need not establish that retaliation was the but-for cause of the adverse employment action, but only that it was a motivating factor.[40] Id.

A plaintiff can make out his prima facie case of retaliation by "demonstrating temporal proximity between his [protected activity] and his discharge [or other adverse employment action]." See El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 932 (2d Cir. 2010). Once the defendant has come forward with a legitimate non-retaliatory reason for his discharge, however, temporal proximity alone "is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext." Id. at 933 (citing cases).

---

[40] The Supreme Court's decision in Gross stated that "plaintiff[s] bringing a disparate-treatment claim pursuant to the ADEA must prove . . . that age was the 'but-for' cause of the challenged adverse employment action," but did not address whether this heightened standard also applies to retaliation claims under the ADEA. 129 S.Ct. at 2352. Since, however, we find that plaintiff has failed to show that age was even a motivating factor in this case, we need not address whether plaintiffs alleging retaliation claims under the ADEA need show that retaliation was the 'but-for' cause of the adverse employment action rather than merely a motivating factor.

"Indeed a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact." Id. (citing Quinn v. Green Tree Credit Corp., 159 F.3d 759, 770 (2d Cir. 1998)).

At the very least, plaintiff participated in "protected activity" potentially giving rise to a retaliation claim when he visited the EEOC on June 7, 2006, and complained that he believed that he had been discriminated against. See Marinelli, 222 F.Supp.2d at 418 (analyzing retaliation claim arising out of an "informal EEOC complaint"). His only evidence that anyone at HDC was aware of this, however, was that he put a two-hour lunch period on his timesheet for that day, and Mariconda signed the timesheet a week later. This is a thin reed on which to base the necessary finding of fact that defendants were aware plaintiff had participated in protected activity.

Plaintiff also participated in protected activity when he informed either Mariconda or McConnell or both of his good-faith belief that he had been discriminated against. See Gregory v. Daly, 243 F.3d 687, 700-01 (2d Cir. 2001) (quoting Matima v. Celli, 228 F.3d 68, 78 (2d Cir. 2000)) ("[Title VII] protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including making complaints

109

to management."). However, plaintiff's testimony regarding when (or if) he complained to Mariconda or McConnell is somewhat contradictory. Plaintiff alleges that he first expressed his concerns to McConnell in their May 25, 2006 meeting (see Pl.'s Rule 56.1 Statement at ¶ 152), but in his deposition testimony, he appears to state that he did not raise the issue of discrimination at that meeting. (Pl. Dep. at 253:19-254:15).[41] He also states that he complained of discrimination to McConnell on June 13, 2006 (see Pl.'s Aff. at ¶¶ 747-752), although McConnell avers that plaintiff never expressed his belief that he had been discriminated against, and never informed her that he had gone to the EEOC. (McConnell Decl., at ¶ 12). Similarly, plaintiff testified at his deposition that he complained of discrimination to Mariconda at their meeting on May 31, 2006 (Pl. Dep. at 294:4-295:7, 304:6-20; see also Pl.'s Rule 56.1 Statement at ¶ 156), but in his affidavit avers only that he informed Mariconda of his belief that Kar was inexperienced and that the decision to promote him was therefore wrong. (See Pl.'s Aff. at ¶¶ 715-724). Despite these apparent contradictions, we will assume for the purposes of this motion that, during one of these conversations, plaintiff told either McConnell or Mariconda, or

---

[41] Plaintiff has never alleged that he complained of discrimination at his May 24, 2006 meeting with Mariconda. (See Pl.'s Aff. at ¶¶ 665-673, Pl. Dep. At 253:12-254:9, 303:6-17).

both, that he believed Mariconda's actions were discriminatory. This is enough to satisfy the first and second prong of the prima facie case. See Henry v. Wyeth Pharmceuticals, Inc., 616 F.3d 134, 147-48 (2d Cir. 2010) ("Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.").

Thus, the earliest point at which plaintiff alleges he undertook protected activity (and defendants were aware of it) was at his first meeting with McConnell on May 25, 2006, less than a month before his termination. Given the temporal proximity between plaintiff's alleged protected activity and his termination, we conclude that, for the purposes of this motion, plaintiff has established a prima facie case of retaliation as to his termination. Since, however, plaintiff's alleged protected activity came only after he learned of Kar's promotion, he cannot establish a causal connection between his protected activity and defendants' failure to promote him, and we recommend that defendants' motion be granted insofar as plaintiff alleges a claim that Mariconda's decision to promote Kar was in some way retaliatory.

We also recommend that defendants' motion be granted as to

111

plaintiff's retaliatory-termination claim, albeit for the reason that plaintiff cannot establish pretext. Defendants have proffered ample non-discriminatory reasons to terminate plaintiff, in the form of plaintiff's insubordination and poor communication skills. In response, plaintiff has pointed four things: (1) his qualifications and the allegedly inadequate qualifications of the other members of the IT Department, an argument that we have found insufficient to show pretext for discrimination, and find likewise insufficient to demonstrate a pretext for retaliation; (2) his conclusory statements at his deposition to the effect that it was obvious that Mariconda discriminated against him based on his age and national origin and retaliated against him for complaining of it (Pl. Dep. at 301:12-24); (3) pages 65-81 of his affidavit, which state in an entirely conclusory fashion that virtually every paragraph of defendants' submitted declarations is a pretext for discrimination against him (see generally Pl.'s Aff. at pp. 65-81); and (4) the temporal proximity of his termination to his complaints of discrimination, which cannot alone create an inference of pretext. See, e.g., El Sayed, 627 F.3d at 932. This is plainly insufficient to establish pretext. Hence we recommend that defendants be granted summary judgment on plaintiff's retaliatory-termination claim.

112

F. Plaintiff's Section 1985 Claims

We must briefly address the fact that the complaint mentions a claim under 42 U.S.C. § 1985, and that defendants address that claim in their motion for summary judgment. "In order to state a conspiracy claim under 42 U.S.C. § 1985(3), a plaintiff must show: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly a person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." Sulehria v. City of New York, 670 F.Supp.2d 288, 297 (S.D.N.Y. 2010) (quoting Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 791 (2d Cir. 2007)). "Further, [t]here must be some racial or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action.'" Russell v. County of Nassau, 696 F.Supp.2d 213, 243 (E.D.N.Y. 2010) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)). Yu has failed to adduce evidence showing that defendants conspired to discriminate against him in an unlawful manner, or in fact that they discriminated against him at all, and we therefore recommend that defendants be granted summary judgment on his claims under section 1985 as well. See Russell, 696 F.Supp.2d at 243-44;

113

Sulehria, 670 F.Supp.2d at 297.


    G. Plaintiff's Final Paycheck


    Finally, we turn to plaintiff's claim that defendants did not
compensate him for his final weeks of work, a claim that survived
our preclusion order. See Yu, 2010 WL 1141196, at *7. We note that
there is some doubt as to whether this claim has been resolved
during the course of this litigation, as it appears that Yu
received a paycheck for that time period in 2010, but it did not
contain interest for the period between 2006 and 2010. (Letter from
Steve Yu to the Court, Apr. 30, 2010). To the extent that Yu may
state a valid claim for relief on this basis, he does so under New
York State contract law, not federal law. Hence we recommend that
the district court decline to exercise jurisdiction over this claim
and dismiss it without prejudice to plaintiff re-filing it in state
court, pursuant to 28 U.S.C. § 1367(c)(3). Cf., e.g., Murray v.
Visiting Nurse Services of New York, 528 F.Supp.2d 257, 280-81
(S.D.N.Y. 2007) (declining to exercise jurisdiction over state-law
claims after dismissing federal discrimination claims).

114

CONCLUSION

For the reasons stated, we recommend that defendants' motion for summary judgment be granted in its entirety, albeit without prejudice to plaintiff re-filing his claim for interest on his final paycheck in state court.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable George B. Daniels, Room 630, 500 Pearl Street, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Secretary of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

115

Dated: New York, New York
      March 15, 2011


_____
MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE



Copies of the foregoing Report and Recommendation have been mailed today to:

Mr. Steve Yu
1025 Esplanade Avenue
Apt. 4G
Bronx, New York 10461

Dean L. Silverberg, Esq.
Anna A. Cohen, Esq.
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York 10177-1211

116